NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-07874

COMMONWEALTH vs. JERMAINE CELESTER.

Plymouth.     October 9, 2015. - February 10, 2016.

Present: Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.

Homicide. Constitutional Law, Assistance of counsel, Confrontation of witnesses, Public trial. Evidence, Spontaneous utterance. Practice, Criminal, Capital case, New trial, Assistance of counsel, Confrontation of witnesses, Conduct of prosecutor, Argument by prosecutor, Public trial.

Indictments found and returned in the Superior Court Department on April 19, 1994.

A pretrial motion to suppress evidence was heard by Robert L. Steadman, J.; the cases were tried before Gordon L. Doerfer, J.; a motion for a new trial, filed on November 2, 2005, was heard by Robert C. Rufo, J.; and a second motion for a new trial, filed on June 20, 2013, was considered by Thomas F. McGuire, Jr., J.

Chauncey B. Wood for the defendant.
Mary E. Lee, Assistant District Attorney, for the Commonwealth.
Kirsten V. Mayer, Maria M. Carboni, David J. Derusha, Mark S. Gaioni, & David Lewis, for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

BOTSFORD, J.  In September, 1995, a Plymouth County jury convicted the defendant, Jermaine Celester, of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty and of armed assault with intent to murder. The victims, Wakime Woods and Derek Gibbs, were shot while walking with the defendant on the night of February 18, 1994. Woods died as a result of his injuries; Gibbs lived, but was rendered a quadriplegic.  On appeal, the defendant challenges the admission in evidence of the decedent's out-of-court statement about who had shot him; the admission of the defendant's statement to police; the prosecutor's conduct, and in particular her closing argument; and the closure of the court room during jury empanelment.  For the reasons discussed in this opinion, we affirm the defendant's convictions, but vacate the order denying his first motion for a new trial and remand the case to the Superior Court for an evidentiary hearing on that motion.

Background.  From the evidence presented at trial, the jury could have found the following facts.[1]  On the evening of February 18, 1994, Wakime Woods and Derek Gibbs were shot near the corner of Green and Newbury Streets in Brockton.  The Commonwealth's theory of the case was that the defendant shot

---

[1] We discuss additional evidence in connection with the issues raised.

both victims because he was seeking revenge for the murder, approximately four months earlier, of his good friend Robert Moses, and believed that Gibbs was refusing to reveal the identity of the person who had murdered Moses.[2]

On the day Gibbs and Woods were shot, Gibbs, Woods, and their friend Demetrious Lynch had been at the Boys & Girls Club in Brockton until 6 P.M. Afterward, they went to a house across the street from the club, where they smoked marijuana and then started walking to Gibbs's house. As the three were walking, two young women drove up in an automobile, and Gibbs and Woods spoke to them. Another vehicle with young women soon arrived,

---

[2] Robert Moses had been shot and killed in September, 1993, in front of the defendant's house on Newbury Street in Brockton. Derek Gibbs and two other young men, Calvin Dyous and Larry Brown, were present when Moses was murdered. The defendant, who was not present, came out of his house immediately after Moses was shot; he was "real upset" and holding a pistol. The defendant considered Moses his "god brother." After Moses was killed, the defendant asked Gibbs for details about Moses's murder "[p]retty much every time [Gibbs] saw him." On one particular occasion in early February, 1994, two weeks before Gibbs and Wakime Woods were shot, the defendant brought Gibbs, Dyous, and Brown together to talk about what had happened the night Moses was killed. The defendant was uneasy, breathing heavily, and pacing. He kept going over and over again what had happened that night, asking Dyous and Brown "to describe . . . everything the way the shooter approached [Moses], just how everything happened . . . . [T]hey kind of had to draw a mental picture." As the conversation continued, it grew louder and participants seemed upset. The defendant insisted that they all go to Boston to look at police photographs in order to identify Moses's killer. (Gibbs and Brown went to Boston with the defendant, but Dyous refused.) At one point, the defendant made reference to "tak[ing] out" all the witnesses to Moses's murder.

and one of its occupants began to argue with one of the young women in the first vehicle.  Both automobiles then left.  When Gibbs, Woods, and Lynch reached Gibbs's house, Lynch continued on to his own house to change his clothes.  Gibbs and Woods went into Gibbs's house.  Thereafter, Gibbs and Woods went outside a few times to see if Lynch and another friend had arrived.  Gibbs at one point was standing alone on the sidewalk in front of his house, and the defendant approached from the side of Gibbs's house through a small alleyway between a store and the house; the defendant "kind of surprised [Gibbs]."  The defendant was wearing a black jacket and dark clothes.  He mentioned that he wanted to go see another friend, Larry Brown (see note 2, supra), and Gibbs agreed.  Woods at that point walked out of Gibbs's house.  The defendant did not know Woods; the two had never met.  Gibbs introduced them:  "This is Bear,[3] . . . this is Wakime."

The three started off toward Brown's house, walking along Green Street.  As they were walking, Gibbs's father pulled up in a van and told them to get out of the street, and the defendant "slipped off to the side," away from the van.  After Gibbs's father drove off, the three resumed walking, with Gibbs in the middle, Woods on the left, and the defendant on the right side of Gibbs.  Suddenly the defendant was no longer in Gibbs's view;

---

[3] The defendant's nickname was "Bear."

"it seemed like [the defendant] just stopped short." Immediately thereafter, Gibbs heard a "pop" -- a gunshot -- and he fell to the ground; he had been shot.[4]

Marlene Scott, who was at her mother's house on Newbury Street, heard gunshots in rapid succession and looked out the window to see a man in dark clothing and a hood running down Green Street toward Newbury Street. Scott jumped back from the window and then went outside. She recognized Gibbs, who was lying in the street, and began to scream. She did not immediately notice anyone else, but then heard a voice from behind a snowbank calling for help; it was Woods. Scott ran over to Woods and asked, "Who shot you? Who shot you?" to which Woods replied, "The kid I was with." Scott followed up, "Do you know him?" and Woods replied, "No."

Sergeant Kenneth LaGrice of the Brockton police department arrived on the scene very soon after the shooting. He first went over to Gibbs, who was lying unconscious in the center of Green Street; he observed a large pool of blood around Gibbs's head and several shell casings in the area of Gibbs's body. Soon after he arrived, LaGrice called for ambulances and medical assistance, and then heard Woods calling for help. He found Woods lying at the base of a snow bank with a tall, thin,

---

[4] Before he heard the shot and fell, Gibbs did not see any motor vehicles or other people in the area, nor did he hear anyone call out to them.

African-American woman nearby -- Marlene Scott, whom he knew. LaGrice asked Woods who had shot him, and Woods initially responded that he did not know, but when asked again, said, "I don't know his name." Woods was "very excited, very scared," and kept repeating that he had been shot and needed help.

Woods was taken by ambulance to the emergency department of Cardinal Cushing Hospital. He was awake and following commands when he arrived, but also was in respiratory distress, having suffered multiple gunshot wounds, including one that had pierced his lung. He was able to speak in short, coherent sentences for a brief period of time, but was deteriorating quickly. Dr. David Mudd, who first treated Woods, asked Woods what had happened to him. Dr. Mudd remembered Woods saying something to the effect of "he had been smoking with some friends and somebody came up to him and shot him." Woods did not say who had shot him. Because the hospital was not able to treat Woods's injuries fully, he was taken by helicopter to Brigham and Women's Hospital, where he died the next morning.

Gibbs, meanwhile, was taken to Brockton Hospital and then transported to Boston City Hospital. He had suffered a bullet wound to the neck. The bullet entered the right side of Gibbs's jaw and exited through the back left side of his neck, tracking from front to back in a slightly downward direction; it fractured Gibbs's second and third vertebrae and severed his

spinal cord at that location, instantly paralyzing him from the neck down.

In the early morning hours of February 20, 1994, while Gibbs was still in the hospital, Brockton police Detective Clifford Hunt showed Gibbs a photographic array. Gibbs identified the defendant,[5] and an arrest warrant for murder (murder warrant) for the defendant was issued. The defendant learned that the police were looking for him, and at approximately 10 A.M. on February 20, the defendant went to the Brockton police station, accompanied by an attorney, James Gilden. With Gilden present, the defendant was given Miranda warnings, signed a form acknowledging that he understood his rights, agreed to speak to the police, and gave a statement, predominantly in narrative form, in which he described meeting Gibbs and Woods (whom he said he did not previously know) on February 18 outside Gibbs's house, walking with Gibbs and Woods toward Brown's house, and encountering young women who arrived in two different automobiles. As the defendant, Gibbs, and Woods approached Newbury Street, the defendant noticed an old Cougar automobile pulled over at the corner of Newbury and Green Streets, and saw the passenger in the vehicle, an African-

---

[5] Detective Clifford Hunt was not asked, and he did not state, whom Gibbs had been asked to identify -- for example, whether Gibbs had been asked to identify the person who had been walking with Gibbs and Woods, or the person who had shot Gibbs and Wood, or perhaps both.

American man who looked like a "body builder," get out, after which Gibbs said, "I feel like something is going to happen tonight."  The defendant then heard a gunshot and saw Gibbs fall.  The defendant did not see anyone in front of them, but thought he saw an automobile up on the hill in the distance with its lights on.  He started running through back yards to get to his house; while running, he heard two more shots and an automobile take off.  The defendant did not call police and did not go outside when he heard police arrive because he did not want to be a witness.

State Trooper Michael Robert Arnold investigated the scene of the shooting and found four spent cartridge casings clustered together and one spent projectile.  Another spent projectile was recovered from Woods's body.  Arnold opined that the four cartridge casings were fired from the same weapon and that the two projectiles were fired from the same weapon.  He further opined that the locations of the casings and projectile at the scene and the results of ballistics testing were consistent with one gun being used, although he could not scientifically connect the projectiles and the casings to one gun.  Arnold found no damage to the projectiles that would suggest that they had ricocheted off any solid objects before striking the two victims.  The casings, which were from a nine millimeter weapon, would travel only a distance of fifteen feet or usually less

when fired, meaning that the shooter was in close proximity to where the casings were found.  Testing on the victims' clothes revealed no gunshot residue, suggesting that the muzzle of the weapon used was further than three feet from the victims at the time it was fired.

Woods had suffered three, possibly four gunshot wounds, three of which were entrance wounds into his back and one of which was an entrance wound into his left thigh.  The entrance wound on Woods's thigh was atypical in appearance.  The entrance point was irregularly round with irregular scraping around it, which could have been caused by the bullet passing through another object or ricocheting off something before hitting the thigh.  In the opinion of Dr. James Weiner, the medical examiner who performed the autopsy, one of the bullets likely entered Woods's back and exited through the abdomen, then "reentered the left groin area and this [was] one continuous wound track if the left leg was raised away from the body and lifted up."

The defendant's statement to the police was introduced in evidence as part of the Commonwealth's case.  The defense theory at trial was that while the defendant was walking with Gibbs and Woods on February 18, 1994, an unknown assailant or assailants had appeared suddenly and shot Woods and Gibbs, causing the defendant immediately to flee toward his own house.  The defendant did not testify, but called Officer Mark Reardon of

the Brockton police as a witness.  Reardon testified that on February 18, he received a police radio transmission about a shooting on Green Street and an alert to be on the lookout for a dark colored, four-door vehicle with tinted windows that had fled the scene.  Shortly thereafter, he observed a vehicle with three African-American male occupants who appeared uneasy as a result of Reardon's observation.  The vehicle was a red, two-door Ford Tempo.  Over the police radio, Reardon described the vehicle; he was told that the vehicle did not appear to be the one that fled the scene of the shooting, but a request was made to pull the vehicle over because it was wanted in connection with an incident that had occurred earlier in the evening.  Reardon pulled over the vehicle on Eagle Avenue and ordered the occupants out; the operator and one occupant ran from the scene.  Reardon held the other occupant at the scene.  He then searched the vehicle but did not find a gun or any casings in it.  The one occupant who had remained was arrested for several motor vehicle offenses.  The other occupants of the vehicle ultimately were identified.[6]  The woman who reported seeing a vehicle fleeing the scene of the shooting, Corrina Defrancesco, was taken to Eagle Avenue by another Brockton police officer, Michael Mather; she observed the vehicle that Reardon had pulled

---

[6] No evidence was introduced at trial concerning the identities of the occupants of the stopped motor vehicle.

over, and then went to the Brockton police station to give a
statement or make a report.[7]

Procedural history.  On April 19, 1994, a grand jury
returned indictments charging the defendant with murder in the
first degree and armed assault with intent to murder.  The
defendant filed a motion to suppress his statements on
voluntariness grounds as well as ineffective assistance of his
first counsel, Gilden.  An evidentiary hearing was held on March
28, 1995, and the motion was denied by a Superior Court judge
(first motion judge).  A different Superior Court judge (trial
judge) presided over the defendant's jury trial that took place
in September, 1995.  Following his convictions, the defendant
filed an appeal and then moved to stay the appeal pending a
motion for a new trial.

The defendant filed his first motion for a new trial in
November, 2005.[8]  He claimed, among other issues, that his

---

[7] No report was introduced in evidence.  A report of a
statement by Corrina Defrancesco was introduced as an exhibit
for identification.  In preparing its response to the
defendant's appeal now before this court, the Commonwealth
located a second page of that report, and has filed a motion to
expand the record to include this page.  The motion is allowed.
The second page indicates that Defrancesco, on viewing the
stopped vehicle on Eagle Avenue, identified it as the same
vehicle she had observed backing down Green Street.

[8] The defendant was convicted more than twenty years ago.
Most of the delay in this case accrued between the defendant's
trial in 1995 and his first motion for a new trial in 2005.  The
record does not indicate the reason for this inordinate delay,

statement to police was admitted improperly because of the ineffective assistance provided by the defendant's first attorney, Gilden; that the Commonwealth failed to give proper notice of expert testimony; that the defendant's trial counsel was ineffective; that Woods's statement, relied upon to identify the defendant as the shooter, was erroneously admitted as an excited utterance; and that the Commonwealth failed to produce a critical witness, Defrancesco, thus depriving the defendant of a substantial defense.  After discovery, a nonevidentiary hearing on the motion was held in April, 2008, before a different Superior Court judge (second motion judge), the trial judge being no longer available.  The second motion judge denied the motion for a new trial in October, 2009, and the defendant's appeal from that denial was consolidated with his direct appeal. In 2013, the defendant filed a second motion for a new trial on the ground that the court room was improperly closed during jury empanelment; yet another Superior Court judge (third motion judge) denied this motion without a hearing in November, 2014. The defendant's appeal from that denial also was consolidated with his direct appeal.

Discussion.  The issues the defendant raises in this appeal are ones that he raised in his two motions for a new trial.  A

---

but unquestionably a delay of this length can pose significant difficulties, and does in this case.

motion for a new trial that is considered in conjunction with a defendant's direct appeal from a conviction of murder in the first degree is reviewed pursuant to G. L. c. 278, § 33E.  See, e.g., Commonwealth v. Morgan, 449 Mass. 343, 353 (2007).

1.  Admission of Woods's statement.  The Commonwealth filed a motion in limine before trial to admit as a spontaneous utterance or dying declaration Woods's statement to Marlene Scott that "the kid [he] was with" shot him.  At a hearing on the motion, defense counsel did not object to its being admitted as a spontaneous utterance.  The judge allowed the statement to come in without specifically deciding whether it qualified as a spontaneous utterance because of defense counsel's concession that it did.

The defendant now argues on appeal that Woods's statement to Scott was so unreliable that its admission violated his due process rights under the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  He also contends that Woods's statement to Scott was testimonial, as the term is described in Crawford v. Washington, 541 U.S. 36, 51-53 & n.4 (2004),[9] and therefore admitted in

---

[9] Crawford v. Washington, 541 U.S. 36 (2004), was decided nine years after the trial in this case.  Crawford is applicable to this case because the direct appeal was still pending at the time that decision was issued.  See Commonwealth v. Burgess, 450 Mass. 422, 426 (2008).

violation of his right to confrontation under the Sixth Amendment to the United States Constitution.

a. Reliability of Scott's testimony. The defendant challenges the existence of sufficiently reliable evidence that Scott in fact spoke to Woods on February 18, 1994, to permit her to testify at trial to Woods's alleged statement about who shot him. He asserts that the trial judge, in his role as gatekeeper, should have prevented the evidence from reaching the jury because of its unreliability. As support, the defendant notes, first, that Sergeant LaGrice arrived moments after Woods's alleged statement to Scott and asked Woods who had shot him, to which Woods replied that he did not know; second, that Woods also told Dr. Mudd, who initially treated him at the hospital, that he did not know who shot him; and finally, that LaGrice testified that only one civilian was at the scene of the crime when he arrived and he ultimately identified that person as Defrancesco, not Scott, thereby suggesting that Scott was not at the scene.

The defendant's argument fails. Scott testified without equivocation that on the night of the shootings, she encountered Woods lying behind the snowbank and talked to him while waiting for the police to arrive. Although the jury certainly were not required to believe Scott, nothing in the record suggests that she was incompetent to testify as a trial witness, or that she

may have been impaired in any way on the date of the shootings. Cf. <u>Demoulas</u> v. <u>Demoulas</u>, 428 Mass. 555, 563-564 (1998). Moreover, contrary to the defense's argument, Scott's testimony was not contradicted at all by the testimony of LaGrice, and only weakly contradicted by Mudd.

LaGrice testified that Woods stated that he did not know who shot him or, more specifically, did not know the name of the person who shot him, while, according to Scott, Woods stated that "the kid" he was with shot him, but he did not know the person. Woods and the defendant had met for the first time on the evening of the shooting, and the defendant was introduced to Woods by his nickname, "Bear." Thus, the jury reasonably could have found that Woods's statements to Scott and LaGrice were substantively consistent. See <u>Commonwealth</u> v. <u>Bush</u>, 427 Mass. 26, 30-31 (1998). Mudd testified that he could not recall Woods's exact words, but "remember[ed] [Woods] saying something about smoking that day and not knowing who had shot him." In contrast to Scott and LaGrice, however, Mudd did not ask Woods who shot him, and his conversation with Woods occurred in the hospital at a point where Woods was in respiratory distress and deteriorating quickly. To suggest that the lack of congruence, in some respects, between Scott's and Mudd's testimony renders the former so unreliable that it was incompetent expands the concept of testimonial incompetence completely beyond

recognition. That two different witnesses may provide inconsistent or conflicting testimony does not turn one of them into an unreliable witness; making judgments about witness credibility and the weight of witness testimony is the function of the jury. See Commonwealth v. Lydon, 413 Mass. 309, 311 (1992), citing Commonwealth v. Martino, 412 Mass. 267, 272 (1992).

Finally, the defendant's claim that LaGrice identified Defrancesco, not Scott, as the person at the scene with Woods when he arrived is not supported by the record. LaGrice testified that he arrived on the scene forty-five seconds after hearing of the shooting, and observed a tall, thin, African-American woman assisting Woods. He identified the woman as Scott, who is African-American, and whom LaGrice knew. LaGrice then mistakenly testified that Scott had reported seeing a vehicle in the area of the shooting, but after his recollection was refreshed, he testified that Scott was not the woman who made the report about the vehicle. The woman who reported the vehicle ultimately was identified as Defrancesco, who is white.[10]

b. Testimonial nature of Woods's statement. Testimonial statements are inadmissible unless the declarant is unavailable

---

[10] Although, as the defendant contends, there may be some inconsistencies in some of the testimony of Brockton police Sergeant Kenneth LaGrice, considered as a whole those inconsistencies do not render Marlene Scott's testimony that she saw and spoke with Wakime Woods unreliable.

for trial and the defendant had a prior opportunity for cross-examination. Crawford, 541 U.S. at 68. "'[O]ut-of-court statements made in response to questions from people who are not law enforcement agents' . . . are not testimonial per se" (emphasis in original). Commonwealth v. Burgess, 450 Mass. 422, 429 (2008), quoting Commonwealth v. Gonsalves, 445 Mass. 1, 11 (2005), cert. denied, 548 U.S. 926 (2006). A statement nevertheless may be testimonial in fact if a "reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting a crime." Gonsalves, supra at 3. See Commonwealth v. Nesbitt, 452 Mass. 236, 244 (2008).

Woods's statement to Scott clearly was not testimonial per se because she was not a law enforcement agent. See Burgess, 450 Mass. at 429. Nor was it testimonial in fact. When Scott found Woods, he had just been shot at least three times. One bullet tore through Woods's liver and right lung, and another tore through several loops of Woods's bowel. The gravity of these injuries, and the immediate threat they posed, likely would "preclude a reasonable person in [Woods's] position from anticipating any nonimmediate future event, including a police investigation or a prosecution of the perpetrator." Nesbitt, 452 Mass. at 249. At the time that Scott and then LaGrice found Woods lying against the snowbank, Woods was "very excited, very

scared" and kept repeating that he had been shot and needed help. In such circumstances, Woods's statement that the "kid" Wood was with shot him was not testimonial in fact, and was admissible. See id.[11]

2. _Ineffective assistance of defendant's first attorney and admission of defendant's prearraignment statement to police_. The defendant argues that the advice he received from his attorney, Gilden, at the time the defendant gave a statement to the police, was constitutionally ineffective under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, and constituted "error" warranting reversal of his convictions under G. L. c. 278, § 33E. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).[12]

---

[11] The defendant asserts that Commonwealth v. Nesbitt, 452 Mass. 236 (2008), is factually very distinct from this case, in that the victim there was closer to death than was Woods -- she died fifteen minutes after making the statement at issue, as compared to ten hours in Woods's case. We view the factual differences as ones of degree, not kind. Given the severity of Woods's injuries, the extreme pain that he was highly likely to be experiencing (as testified to by Dr. David Mudd), and the excited and frightened state that Woods was in when he spoke to Scott and LaGrice, we do not accept the defendant's premise that the factual differences between this case and Nesbitt make that case wholly distinguishable.

[12] The defendant raised a claim of ineffective assistance of counsel in his pretrial motion to suppress his statement and again in his first motion for a new trial. In denying the motion to suppress, the first motion judge concluded that the defendant's waiver of his Miranda rights was knowing and

a.  Background.  The first motion judge held an evidentiary hearing on the defendant's motion to suppress his statement.  We summarize here his findings.[13]  Detective Hunt responded to the scene of the shootings on February 18, 1994, and as a result of his interviews of witnesses and investigation, he sought and obtained a murder warrant for the defendant in the early morning of February 20.  The defendant's uncle contacted Gilden and asked him to represent the defendant.  Gilden telephoned the defendant, who told Gilden about a shooting that had taken place in Brockton and stated he was scared to go to the police station and tell what had happened.[14]  Gilden then telephoned the Brockton police around 8 A.M. on February 20.  He spoke to Hunt, who informed him that Hunt had a murder warrant for the

_____

voluntary, that his statement was voluntary, and that he had received competent assistance of counsel.  The second motion judge also denied the claim, although he did not affirmatively determine whether the defendant's counsel at the time of making his statement had been ineffective.

[13] The only witness to testify at the evidentiary hearing on the defendant's motion to suppress was Detective Hunt.  The defendant submitted an affidavit in support of his motion to suppress and the Commonwealth introduced an affidavit of James Gilden as an exhibit at the motion hearing, but neither the defendant nor Gilden testified at that hearing.

[14] The first motion judge's memorandum of decision includes these findings about the defendant's uncle contacting Gilden as well as about the exchange between Gilden and the defendant concerning the defendant's desire to have a lawyer accompany him to the Brockton police station.  Because Gilden did not testify at the motion hearing, we infer that the judge based these findings on Gilden's affidavit.

defendant. Gilden picked up the defendant and drove him to the Brockton police station around 10 A.M. on the same day. On the way, Gilden advised the defendant that he should tell the truth if he gave a statement.

The first motion judge further found that, when the defendant and Gilden arrived at the police station, they were taken to the interrogation room. Hunt showed both Gilden and the defendant the murder warrant, and both reviewed it without comment. Hunt then placed the defendant under arrest.[15] Hunt next read the defendant the Miranda rights from a sheet while Gilden was present and listening. The defendant signed a waiver form that stated that he understood his rights. Gilden witnessed the waiver. Thereafter, the defendant gave a statement to Hunt. Gilden was present throughout, but at no time did the defendant ask to speak privately to Gilden. Hunt did not record the statement, but took notes of what the defendant said. The interview was approximately one hour long, and thereafter the defendant was taken to be booked. At the time of making the statement, the defendant was twenty-one years old and of average intelligence, appeared calm and responsive,

---

[15] Hunt did not testify explicitly that he had placed the defendant under arrest before the defendant had made his statement, but Hunt did testify that he had advised the defendant that he was under arrest before the defendant's statement.

and did not appear to be under the influence of drugs or alcohol.

Based on these findings, the first motion judge denied the defendant's motion to suppress, concluding that the defendant's waiver of his Miranda rights was knowing and voluntary, that the defendant's statement was voluntary, and that he had received competent assistance of counsel. The judge's memorandum of decision does not mention or refer to the defendant's affidavit filed in support of his motion to suppress. That affidavit, dated February 7, 1995, sets out a number of the facts contained in the judge's findings, but also adds the following. While being driven by Gilden to the Brockton police station, the defendant told Gilden what he knew about the shooting, and Gilden told the defendant that all he had to do was explain to the police what happened, which the defendant understood to mean that if he told the police what he had told Gilden, he would be free to leave the police station thereafter. When they arrived at the police station, the defendant was taken into an interrogation room, accompanied by Gilden and a police officer. Gilden and the police officer spoke together outside the room, and when they returned to the room, Gilden told the defendant, "[T]ell him what you told me," and the defendant did so. When the defendant finished, the officer arrested him for murder. If the defendant had known that he was a suspect in the murder

investigation, and not simply a witness, he never would have made a statement; he had been arrested many times in the past and was aware that a person under arrest has the right not to make any statement.

Gilden's affidavit, dated March 23, 1995, stated that after he contacted the defendant at the request of the defendant's uncle, the defendant said that the police were looking for him in connection with a shooting in Brockton, and asked Gilden to accompany him to the police station because he was scared to go alone. Gilden then called the Brockton police and spoke to Hunt, who informed him of the murder warrant for the defendant. Gilden indicated that he would bring his client to the station. Gilden picked up the defendant in Boston and drove to Brockton. On the way, the defendant showed Gilden where the shooting had taken place and "told [him] how the shooting had occurred." The two also talked about the defendant speaking to the police and telling the police what the defendant had told Gilden concerning the shooting. The defendant never asked Gilden whether he should speak to police, and "[t]he only advi[c]e that [Gilden] gave [the defendant], before [they] went to the police station, was that [the defendant] should tell the truth if he gave a statement to police." When they arrived at the police station, Hunt showed Gilden the Miranda form and Gilden witnessed the defendant read and sign it; the defendant did not ask Gilden any

questions about the Miranda rights he was given.  Gilden was present throughout the time the defendant spoke to Hunt, but the defendant never asked to speak to Gilden while he was giving his statement.  After the defendant completed his statement, he was taken by Hunt to be booked, and just before he left, the defendant said, "'You mean they are really going to hold me?,' or words to that effect."[16]  Gilden left the police station after the defendant was booked, but the next day, Hunt telephoned and told him that the defendant wanted to speak to the police again and asked Gilden to come to the station.  Gilden did so, spoke privately with the defendant, suggested to the defendant that "further conversation with the police would not be helpful," and told the police that the defendant would not be speaking with them.[17]

---

[16] Although Gilden's affidavit did not so state, at trial, Hunt testified that during the police interview of the defendant, Gilden, in Hunt's presence, told the defendant to "tell the police officer what you told me," and the defendant then gave his statement.

[17] In connection with the defendant's first motion for a new trial, the defendant and Gilden each filed an additional affidavit, dated October 4, 2005, and October 6, 2005, respectively.  These affidavits include, among other topics, information relating to the defendant's giving of his statement to Hunt on February 20, 1994, and the interactions between the defendant and Gilden in connection with that event.  There are some differences between the 1995 and 2005 affidavits of each person, but at least with respect to the defendant, the differences are not substantial, and do not affect our analysis of his claim of ineffective assistance.  (Gilden's 2005 affidavit appears to to be somewhat more consistent than his

b.  <u>Discussion</u>.  The defendant argues that he was entitled

to the effective assistance of counsel under the Fifth Amendment

and art. 12 in connection with his giving a statement during

Hunt's custodial interrogation of him on February 20, 1994.

The right to counsel protected by the Sixth Amendment does

not come into play until the time of arraignment.  See, e.g.,

<u>United States</u> v. <u>Gouveia</u>, 467 U.S. 180, 188 (1984).  To date,

this court has followed the same rule with respect to art. 12.

See, e.g., <u>Commonwealth</u> v. <u>Anderson</u>, 448 Mass. 548, 553-554

(2007).  See also <u>Commonwealth</u> v. <u>Lavallee</u> v. <u>Justices in the</u>

<u>Hampden Superior Court</u>, 442 Mass. 228, 234-235 (2004) ("The

right to trial counsel under art. 12 attaches at least by the

time of arraignment").  However, a defendant is entitled to the

assistance of counsel under the Fifth Amendment to protect his

or her right against self-incrimination.  In <u>Miranda</u> v. <u>Arizona</u>,

384 U.S. 436, 469 (1966), the United States Supreme Court

recognized that the right to have counsel present at a custodial

interrogation is "indispensable to the protection of the Fifth

Amendment privilege."  See <u>Johnson</u> v. <u>New Jersey</u>, 384 U.S. 719,

_____

1995 affidavit was with the defendant's averments that the
defendant did not learn he was being charged with murder until
after he had made his statement to the police, but this
difference also does not affect our analysis.)  Moreover, it is
clear from the defendant's brief on appeal that he has relied on
his own and Gilden's 1995 affidavits in presenting his
arguments.  Accordingly, we do not summarize or discuss here the
contents of the two affidavits prepared in 2005.

729 (1966) ("Our opinion in Miranda makes it clear that the prime purpose of these rulings is to guarantee full effectuation of the privilege against self-incrimination, the mainstay of our adversary system of criminal justice").  The same is true to an even greater extent under art. 12.  See Commonwealth v. Mavredakis, 430 Mass. 848, 858-860 (2000).  See also Commonwealth v. Clarke, 461 Mass. 336, 345-346 (2012); Commonwealth v. McNulty, 458 Mass. 305, 314-319 (2010).  This court has emphasized the need under art. 12 to ensure that the abstract rights listed in Miranda, including the right to speak with an attorney, are "actualize[d]" and "substantively meaningful."  Mavredakis, supra at 860.

With respect to art. 12, we have not before explicitly considered whether the right to the assistance of counsel that art. 12 provides in connection with a prearraignment, custodial interrogation is a right to the effective assistance of counsel.[18,19]  We do so here, and in that connection, we agree

---

[18] In Commonwealth v. Smiley, 431 Mass. 477, 480-481 (2000), the defendant, who, after consulting counsel but before arraignment, had given a statement to police, argued that the statement should be suppressed because it was the product of ineffective assistance of counsel.  Quoting Commonwealth v. Griffin, 404 Mass. 372, 374 (1989), a case concerning a statutory right to counsel, we noted that a right to counsel is of little value if the assistance given is not effective. Smiley, supra at 481. We ultimately upheld the motion judge's denial of the suppression motion because there was no showing of ineffectiveness on the part of defendant's counsel.  Id. at 481-482.  We did not address specifically whether the constitutional

entitlement to counsel in connection with a custodial interrogation includes an entitlement to effective assistance of counsel.

[19] We focus only on art. 12 of the Massachusetts Declaration of Rights. There do not appear to be many Federal cases considering whether the right under the Fifth Amendment to the United States Constitution to assistance of counsel in connection with a custodial interrogation is a right to effective assistance of counsel, and those that have considered the question have not answered it affirmatively. See, e.g., United States v. You Hong Chen, 104 F. Supp. 2d 329, 333-334 (S.D.N.Y. 2000). See also Claudio v. Scully, 791 F. Supp. 985, 988 (E.D.N.Y.), rev'd on other grounds, 982 F.2d 798 (2d Cir. 1992). The United States Supreme Court does not appear to have considered specifically whether the Fifth Amendment right to assistance of counsel in connection with a custodial interrogation is a right to effective assistance of counsel. See Sweeney v. Carter, 361 F.3d 327, 333 (7th Cir.), cert. denied, 543 U.S. 1020 (2004) ("as far as we can tell, the Supreme Court has not mentioned effective assistance of counsel [in the Strickland (v. Washington, 466 U.S. 668, 690-691 [1984],) sense] and the Fifth Amendment in the same breath, let alone set forth a clearly established right to that effect").

With respect to other States, again the issue we consider does not appear to have been addressed in many cases. Compare Claudio, 982 F.2d at 804-805 (reversing denial of Federal habeas corpus relief because reasonable probability existed that defendant would have succeeded on claim that New York law required defendant receive effective assistance of counsel during precharge custodial interrogation), and State v. Joseph, 109 Haw. 482, 501 (2006) (Nakayama, J., concurring) (taking position that defendant's statement during custodial interrogation should be suppressed because defendant received ineffective assistance of counsel when attorney advised him to speak with police), with People vs. Frazier, No. 95-052613-FC (Mich. Ct. App. Feb. 27, 1998) (no right to effective assistance of counsel during postarrest, prearraignment custodial interrogation). Cf. Phelps v. State, 435 So. 2d 158, 161 (Ala. Crim. App. 1983) (lawyer's advice over telephone to defendant to confess to crime before being charged not ineffective assistance as matter of law); Riddle v. State, 580 So. 2d 1195, 1201-1202 (1991) (not per se ineffective assistance of counsel for lawyer to advise defendant to confess to crime during precharge custodial interrogation).

with the defendant that a person's right to speak with counsel is not "actualize[d]" or "substantively meaningful" if counsel fails to provide at least minimally competent advice. Otherwise, counsel is not meeting the purpose of ensuring that a defendant have a right to consult counsel in connection with a custodial interrogation. See Mavredakis, 430 Mass. at 859-860. See also Commonwealth v. Morales, 461 Mass. 765, 779-780 (2012) (discussing Mavredakis, supra, and McNulty, 458 Mass. at 314-319).[20]

Our case law concerning the right to counsel in other settings supports this conclusion. For example, when a statute provides a right to the assistance of counsel, we have held that it is a right to the effective assistance of counsel, governed

---

[20] In Commonwealth v. Simon, 456 Mass. 280, cert. denied, 562 U.S. 874 (2010), the defendant, accompanied by his attorney and after having had the opportunity to speak with his attorney, agreed to speak with the police in what was a custodial interrogation taking place in the early stages of a murder investigation. The police did not give the defendant Miranda warnings before the interrogation began. In reviewing an interlocutory appeal of the denial of the defendant's motion to suppress his statement, we held that in the context of a custodial interrogation of a criminal suspect, "the presence of an attorney during questioning, when combined with the opportunity to consult with the attorney beforehand, substitutes adequately for Miranda warnings." Id. at 289. In Simon, the defendant did not claim that the attorney accompanying him had provided ineffective assistance of counsel. However, our conclusion in that case -- that the presence of an opportunity to consult an attorney renders the administration of Miranda warnings unnecessary -- underscores the need to recognize that the right to the assistance of counsel articulated in Miranda and Mavredakis is a right to the effective assistance of counsel.

by the standard in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). See, e.g., Poe v. Sex Offender Registry Bd., 456 Mass. 801, 811-812 (2010) (sex offender classification hearing); Commonwealth v. Griffin, 404 Mass. 372, 374-375 (1989) (appearance before grand jury). In Commonwealth v. Patton, 458 Mass. 119, 128 (2010), which raised the issue whether a defendant is entitled to the effective assistance of counsel in a probation revocation proceeding, in discussing cases such as Poe and Griffin, we concluded that "[t]he principle that emerges from these cases is that in a proceeding that involves a person's liberty or a fundamental liberty interest, in which a person has a right to appointed counsel, from whatever source, the person is entitled to the effective assistance of counsel whether counsel is appointed or retained." A custodial interrogation of a criminal suspect certainly involves a fundamental liberty interest. It follows that the constitutionally based right to counsel in this setting must be recognized as a right to the effective assistance of counsel. See Commonwealth v. Moreau, 30 Mass. App. Ct. 677-679 (1991), cert. denied, 502 U.S. 1049 (1992).[21]

---

[21] In Commonwealth v. Moreau, 30 Mass. App. Ct. 677 (1991), cert. denied, 502 U.S. 1049 (1992), the defendant appealed from the denial of his motion to vacate his guilty pleas to charges of armed burglary and related crimes on the basis of ineffective assistance of counsel. One of his claims was that counsel was ineffective in advising him, after he had been arrested but

The defendant contends that Gilden provided ineffective assistance by instructing or advising him to make a statement to police that had an inculpatory effect -- at a minimum, it placed the defendant at the scene of the crime -- and by providing such advice without conducting any investigation of the case and despite the fact that the defendant had been arrested for murder.[22]  Although it appears, if we accept the averments in

---

before arraignment on the charges, to make a statement to the police describing his involvement.  Id. at 678-680.  The judge denying the motion to vacate had done so without an evidentiary hearing; the Appeals Court vacated the denial and remanded the case for such a hearing, stating:  "The defendant was, however, entitled to the aid of counsel to protect his Fifth Amendment privilege against self-incrimination under Miranda v. Arizona . . . .  Since 'a right to counsel is of little value unless there is an expectation that counsel's assistance will be effective,' . . . the defendant's claim of ineffective assistance of counsel must be examined" (citations omitted).  Id. at 679, quoting Commonwealth v. Griffin, 404 Mass. 372, 374 (1989).

[22] The defendant argues also that Gilden had an actual conflict of interest that rendered his assistance ineffective. Gilden apparently served as surety for the appointed conservator of the defendant's father, at least when the father was alive (the father died in 1990).  In addition, according to affidavits filed in connection with the defendant's first motion for a new trial, Gilden may have had some continuing role in connection with the administration of the defendant's father's estate, although the actual facts are not at all clear from the record. In January, 1992, a brother of the defendant raised a challenge to the administration of the father's estate.  The defendant argues that Gilden's interests were antagonistic to all of the heirs of the father's estate, including the defendant, because of this challenge.  There is no evidence, however, of an actual conflict of interest, see Commonwealth v. Croken, 432 Mass. 266, 271-272 (2000), and according to Gilden, he did not learn of any dispute involving the father's estate until at least two years

Gilden's affidavit, that Gilden, with the guidance of the defendant, conducted some investigation of the scene of the shootings, we agree that the advice he thereafter gave the defendant was constitutionally ineffective under art. 12.

According to the first motion judge's findings, Gilden had been informed that the police held a murder warrant for the defendant by the time Gilden picked up the defendant to drive to the Brockton police station, and Gilden was actually shown the warrant when he arrived at the station. We understand Gilden's affidavit to indicate that Gilden never discussed with the defendant his right against self-incrimination or any of the risks inherent in giving a statement to the police before the defendant made his statement, and also said nothing to the defendant before, during, or after Hunt read him the Miranda rights and inquired about the defendant's understanding and willingness to speak to the police. Rather, it appears from the record before us that the only statement Gilden made during the defendant's interview with Hunt was to direct the defendant to tell Hunt what the defendant had told Gilden.

In this context, as the defendant's lawyer, Gilden had an obligation at the very least to discuss with his client the self-incrimination privilege and the potential consequences of

---

after the defendant gave his statement to police. We do not consider the claim of conflict of interest further.

giving a statement to the police.  Compare <u>Commonwealth</u> v. <u>Smiley</u>, 431 Mass. 477, 481 (2000) (counsel not ineffective where he appropriately advised defendant of consequences of making statement to police and of waiving privilege against incrimination).  This was especially true in light of Gilden's very brief and very limited investigation of the facts of the case, namely, driving by the location where the shooting had occurred and hearing the defendant's version of the events.  In that version, the defendant denied any involvement in the shooting, and instead placed the blame on a third-party culprit.  Given that Gilden already knew of the murder warrant, it should have been obvious to him that the defendant's description of events differed materially from the view of the case taken by the police.  Before advising the defendant during the drive to the police station simply to "tell the truth if he gave a statement to the police," and particularly before stating to the defendant during the police interview to "tell [the police] what [he] told [Gilden]," Gilden should have made an effort at a minimum to understand the factual basis for the murder charge that had been lodged against the defendant.[23]  Although,

_____

[23] We do not suggest here that counsel for a criminal defendant has an obligation always to advise his or her client not to speak to the police, or that counsel may never properly advise a client to make a statement to the police.  The point is that in a case such as this, where counsel's client was being charged with murder, before affirmatively advising a client to

according to Gilden, the defendant did not ask Gilden any questions while he was reviewing the Miranda form or giving his statement, this did not relieve counsel of the affirmative duty to discuss the risks and consequences of making a statement to the police with the defendant.  See American Bar Association Standards for Criminal Justice, Defense Function, Standard § 4-3.7(a) (4th ed. 2015) ("Defense counsel should inform the client of his or her rights in the criminal process at the earliest opportunity, and . . . take necessary actions to vindicate such rights . . .").[24]

The Commonwealth argues that the defendant knowingly and voluntarily waived his Miranda rights and agreed to speak with the police, as both the first and second motion judges determined to be the case, and therefore the defendant's statement to the police is admissible without more.  We do not agree.  It is of course true that a suspect with whom the police

_____

speak about the case to the police, it is necessary for counsel to undertake some investigation of the charge and the government's evidence.  See Moreau, 30 Mass. App. Ct. at 683 n.4 (in determining whether to advise client to speak with police, counsel had to undertake some investigation as to basis of information given by police).

[24] In certain circumstances, it may not be possible for counsel to undertake any investigation of charges pending against the client before counsel is obliged to provide advice concerning whether to speak to the police.  In such a situation, the need to advise the client about the risks of speaking with the police appear to be even stronger.  See E. Blumenson & A.B. Leavens, Massachusetts Criminal Practice § 19.2 (4th ed. 2012).

seek to conduct a custodial interrogation may validly waive his or her Miranda rights, including the right to counsel, without an attorney being present and without having first been advised by an attorney.  But where, as here, the suspect, accompanied by his attorney, appears for what will be a custodial interview, the suspect has already exercised his right to have an attorney present to assist him, and he is entitled to receive effective legal assistance from that attorney.  See Moreau, 30 Mass. App. Ct. at 679.  It would undermine the promise of Miranda and Mavredakis if it were otherwise.  The affidavits of the defendant and Gilden are consistent in terms of the advice Gilden gave to his client on February 20, 1994.  Together, these affidavits indicate, and we conclude, that Gilden's performance as the defendant's attorney on that date fell "measurably below that which might be expected from an ordinary fallible lawyer." Saferian, 366 Mass. at 96.  In the context of a case of murder in the first degree, the question that arises is whether Gilden's error created a substantial likelihood of a miscarriage of justice.  See Wright, 411 Mass. at 681.  The answer requires consideration of two further points:  (1) whether Gilden's erroneous legal advice caused the defendant to give his statement to the police; and (2) if so, whether the evidence of the statement at trial "was likely to have influenced the jury's conclusion."  Id. at 682.

We focus on the second point first, because if the jury were not likely to have been influenced by the defendant's statement, there would be no need to consider the first point. If we assume that the defendant's statement to the police was a direct consequence of Gilden's ineffective assistance, the error did create a substantial likelihood of a miscarriage of justice. The defendant's statement, admitted at trial, placed him directly at the scene of the crime at the exact time the crime was committed, strongly reinforcing Gibbs's trial testimony. This was significant because the actual shooting incident here happened very quickly, and Gibbs did not see who shot him. And although Woods identified the shooter as "the kid [he] was with," the strength of the identification may have been subject to question, given Woods's condition at the time he was speaking and the fact that he had been shot in the back, suggesting the shooter was behind him and out of view. Moreover, the prosecutor, in her closing, was able to use the statement extremely effectively, pointing out the differences between what the defendant had stated in comparison to Gibbs, and arguing that the differences demonstrated that the defendant was lying and pointed to consciousness of guilt on his part; based on these statements, the judge gave a consciousness of guilt instruction to the jury.[25] In all these circumstances, the jury

---

[25] The prosecutor also was able to make a persuasive

were likely to have been influenced by the defendant's statement in reaching their verdicts.

Given this result, we must consider the first point, that is, whether Gilden's ineffective legal advice caused the defendant to give his statement to the police. The defendant states in his affidavit that he would not have made a statement if he had understood the police had identified him as a suspect who may have committed the murder, and that he only made the statement because he assumed that he was merely a witness -- an assumption he states was based directly on Gilden's ineffective advice to tell the police what he had told Gilden. However, the first motion judge found -- presumably based on the testimony of Hunt, the sole witness at the motion hearing -- that before he gave his statement, the defendant was both shown the murder warrant and placed under arrest, or advised that he was (see note 15, supra) -- circumstances that certainly might suggest the defendant in fact did know that he was a suspect when he spoke. More significantly, these circumstances also might suggest -- given the defendant's acknowledgement in his affidavit that he was well aware a criminal suspect has the

argument that if the defendant heard the interchange among Gibbs, Woods, and various young women in one or two automobiles -- as the defendant told Hunt in his statement that he did -- it must have been because the defendant was secretly following Gibbs and Woods, "lying in wait" until they were alone, because, as Gibbs testified, the defendant was not with Gibbs and Woods when they encountered the young women.

right <u>not</u> to speak to the police -- that the defendant chose to speak independently of any advice or directive from Gilden.[26] However, the defendant did not testify at the evidentiary hearing held by the first motion judge, and nothing in the judge's opinion indicates that the judge considered or had even read the defendant's affidavit, which, in contrast to Gilden's, was not introduced as a motion exhibit. As for the second motion judge, he did not hold an evidentiary hearing.[27] In any event, neither the first nor the second motion judge could appropriately make findings of fact concerning the defendant's knowledge or the reasons he gave his statement based on the defendant's affidavit or affidavits alone.

In these circumstances, we conclude that it is necessary to vacate the denial of the defendant's first motion for a new trial and to remand the case to the Superior Court for an evidentiary hearing before the second motion judge. This hearing has a narrow purpose. The second motion judge must

---

[26] It is also possible that the defendant might have chosen to give a statement because it gave him an opportunity to put forth his claim of a third-party culprit -- i.e., that an unknown man the defendant saw get out of a Cougar automobile on the corner of Green and Newbury Streets was the likely shooter.

[27] The second motion judge concluded that no hearing was necessary because the defendant had knowingly and voluntarily waived his Miranda rights and agreed to speak to the police. For the reasons earlier discussed in the text, however, we do not consider the defendant's waiver of Miranda rights to be dispositive of his ineffective assistance claim.

determine whether the defendant's statement to the police on that date was the direct consequence of Gilden's deficient legal advice, or whether, independently of Gilden's advice, the defendant made his own voluntary and knowing decision to waive his right against self-incrimination and to speak to the police.[28]  If the judge finds that the defendant gave his statement directly because of Gilden's deficient advice, the defendant's first motion for a new trial should be allowed; if the judge, however, determines that the defendant independently decided to give his statement, the motion should be denied.

We turn to the defendant's remaining arguments.

3.  <u>Prosecutorial misconduct</u>.  The defendant contends that his due process rights were violated because the prosecutor in her closing argument misused the facts at trial to such an extent that she rendered the trial fundamentally unfair.  He argues that in her closing, the prosecutor misrepresented "the most exculpatory" set of facts in the case, which he claims included (1) Defrancesco's observation of a vehicle driving away from the scene of the shooting with its lights off; (2) Officer Reardon's stop of a vehicle matching the description soon thereafter and the immediate flight taken by two of the

---

[28] At the evidentiary hearing, we anticipate that the judge will hear testimony from the defendant and Gilden, who appears to continue to be an active member of the Massachusetts bar, and perhaps Hunt, if he is available.

automobile's occupants; and (3) Defrancesco's inspection of the vehicle stopped by Reardon to determine whether it was the same one -- which, in fact, Defrancesco had stated it was, as shown by the recently discovered second page of Hunt's written summary of his interview of Defrancesco.[29]  The defendant's claim in this regard is that the prosecutor first misrepresented specific points of evidence concerning these facts, culminating in her misleading statement that the automobile that Reardon stopped "had nothing to do with this [case]."  We disagree that this statement was improper.  What the evidence showed was that, after stopping the vehicle, Reardon found no evidence of a gun or any shell casings.  It was also shown that the police eventually determined the identities of the passengers, but there was no evidence suggesting that the passengers had anything to do with the shooting of Woods and Gibbs.  Based on this information, it was not improper for the prosecutor to draw and argue the inference that the vehicle had nothing to do with the shooting.  See Commonwealth v. Murchison, 418 Mass. 58, 59-60 (1994).

The defendant also contends that the reason Defrancesco could not be located and therefore could not be called to testify about the vehicle leaving the scene of the shooting was that the prosecutor negligently or intentionally suppressed

_____

[29] See note 7, supra.

evidence of the fact that Defrancesco had a criminal record, which might have led to information concerning Defrancesco's then current address or location. The defendant analogizes this to those situations in which a prosecutor "exploit[s] the absence of evidence that had been excluded at his request." Commonwealth v. Carroll, 439 Mass. 547, 555 (2003).

The record does not support the defendant's argument. Rather, it reflects that the prosecutor had tried a number of times to subpoena Defrancesco to appear at the trial, with no success.[30] It is true that Defrancesco actually had three pending charges in the Brockton Division of the District Court Department at the time of the trial in this case, presumably being prosecuted by others in the prosecutor's office. It also might be the case that an examination of case records associated with those charges may have revealed a more accurate address for

---

[30] With respect to locating Defrancesco, the record contains the following. On the first day of trial, the prosecutor told the trial judge and the defense that she had summonsed DeFrancesco, but had not heard from her. Two days later, the prosecutor indicated that she had summonsed Defrancesco again, but could not ensure Defrancesco's appearance because she was not sure she had located the correct woman. On the fourth day of trial, the prosecutor stated that a State police trooper went to the last known address of Defrancesco, but the house was abandoned. The trooper then sought to find Defrancesco in the registry of motor vehicles data base; a "Corrina Defrancesco" was located in Taunton, and the prosecutor summonsed her there, but there was no response. The prosecutor stated to the judge that she did not believe Defrancesco had a criminal record, meaning that she could not locate Defrancesco through a criminal registry.

DeFrancesco than the ones used by the prosecutor in this case. However, there is nothing in this record to indicate that the prosecutor herself knew of these pending charges, and in the absence of information showing that the charges had been entered in a probation record for Defrancesco or some similar database, we cannot say that she intentionally or negligently failed to take appropriate steps to discover them. In fact, defense counsel, with the assistance of an investigator, sought unsuccessfully to locate Defrancesco throughout the trial.

The defendant also takes issue with the prosecutor's statement during closing that Trooper Arnold, who testified on behalf of the Commonwealth as an expert witness concerning ballistics, opined that only one gun was used during the shooting.[31] We agree that the prosecutor's statement was improper. During trial, the jury heard from Arnold that the

---

[31] In her closing, the prosecutor stated:

"You also heard, ladies and gentlemen, from Trooper Arnold. And Trooper Arnold, from his qualifications and his years is definitely an expert. And what did Trooper Arnold tell you, ladies and gentlemen? . . . Number one, Trooper Arnold told you that the four casings in this case were the same type, that they all had CCI-NR 9mm Luger written on the bottom. . . . And the two projectiles were of the same type, I believe the term was full metal jacket. . . . And what did he tell you about these, ladies and gentlemen? He told you that the projectile, the projectile of this type, a full metal jacket projectile is only manufactured by CCI. CCI. And what did that tell Trooper Arnold? What was his opinion? That there was one gun. One gun. Not two, not three, not four. One. That was his opinion. . ." (emphasis added).

evidence was consistent with a single gun being used, but that he could not say scientifically that this was the case.[32] The trial judge then instructed the prosecutor that she could not elicit Arnold's opinion whether one gun had been used. Defense counsel, however, did not object to the prosecutor's reference in her closing to Arnold having an opinion that there was only one gun; the question, therefore, is whether the prosecutor's improper remark created a substantial likelihood of a miscarriage of justice. It did not.

---

[32] At trial, the following exchange took place following a question by the prosecutor whether, from all the evidence at the scene that he observed and the ballistic testing he performed, the ballistic items taken from the scene were consistent with one gun being used:

Trooper Arnold: "First of all, the microscopic comparison of the four cartridge casings, with that I was able to determine they were all fired by one individual weapon. The microscopic comparison of the two spent projectiles I was able to determine that they were all fired through the same unknown barrel or same unknown weapon. Scientifically I cannot tie those two spent projectiles and the four cartridge casings together. In other words, without a suspect weapon I can't scientifically say that one weapon was used. However, examining -- physically examining and doing some work on the projectiles, I can determine that they are consistent with those cartridge casings manufactured by CCI. The total metal jacketed projectile, the only manufacturer that I've ever seen using that is CCI" (emphasis added).

. . .

The prosecutor: "And is CCI the casings that were in this case?"

Trooper Arnold: "Correct."

The trial judge instructed the jury that closing arguments were not evidence and only facts in evidence could be considered during deliberations. More significantly, as Arnold's quoted testimony reflected (see note 32, supra), in his view, the ballistics evidence in the case strongly supported a conclusion that only one gun had been used, but Arnold could not so opine as a matter of ballistics certainty. In the circumstances, there appears to be little risk that the prosecutor's comment improperly led the jury to accept a conclusion about Arnold's opinions that was not supported by evidence properly before them.

4. Right to a public trial. In his second motion for a new trial, the defendant argued for the first time that his Sixth Amendment right to a public trial was violated when his brother and mother were prevented from entering the court room during jury empanelment. "It is well settled that the violation of a defendant's right to a public trial is structural error requiring reversal." Commonwealth v. Wall, 469 Mass. 652, 672 (2014). Nevertheless, even structural error is subject to waiver. Id. The third motion judge determined that the defendant's failure to raise this issue in his first motion for a new trial constituted waiver.

In Wall, we stated that "[w]here defense counsel did not object to any alleged court room closure at trial, and the

defendant failed to raise the claim in his first motion for a new trial, . . . the defendant's right to a public trial during jury empanelment has been waived."  Wall, 469 Mass. at 673.  See Commonwealth v. Morganti, 467 Mass. 96, 102-103, cert. denied, 135 S. Ct. 356 (2014); Commonwealth v. Alebord, 467 Mass. 106, 112-113, cert. denied, 134 S. Ct. 2830 (2014).  The defendant argues, however, that Wall is inapplicable to his case because any waiver amounted to ineffective assistance of counsel.  Specifically, he asserts that trial counsel and counsel handling his first motion for a new trial provided ineffective assistance because they were unaware that exclusion of the public from jury selection violated the defendant's Sixth Amendment right.[33]  This ignorance of the law, the defendant claims, constituted unreasonable performance requiring reversal of his convictions.  See Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014).

The defendant's argument fails.  In light of our decisions in Morganti and Alebord -- cases that, like this one, were tried in the Superior Court in Brockton before 2007 -- there is little if any basis to claim that either trial counsel or the defendant's counsel at the time of his first motion for a new

---

[33] Each counsel provided an affidavit in connection with the defendant's second motion for a new trial admitting that he had been unaware that the right to a public trial under the Sixth Amendment to the United States Constitution extended to jury empanelment.

trial was ineffective.  See Morganti, 467 Mass. at 97-98, 103-105.  See also Alebord, 467 Mass. at 114.[34]

In any event, the defendant's claim of ineffective assistance of counsel fails because he has not shown prejudice. Where a defendant procedurally waives his Sixth Amendment public trial claim, and later raises the claim as one of ineffective assistance of counsel, as is the case here, "the defendant is required to show prejudice from counsel's inadequate performance" -- that is, a substantial likelihood of a miscarriage of justice -- and "the presumption of prejudice that would otherwise apply to a preserved claim of structural error does not apply."  Commonwealth v. LaChance, 469 Mass. 854, 856 (2014), cert. denied, 136 S. Ct. 317 (2015).  See Commonwealth v. Jackson, 471 Mass. 262, 268-269 (2015).  The defendant has not presented any evidence of prejudice, that is, evidence

---

[34] We reject the defendant's suggestion that Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014), overruled Morganti or Alebord.  In Hinton, supra at 1089, the United States Supreme Court held that "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance."  In Hinton, the indigent defendant's trial counsel failed to seek additional funds that were available under State law to hire a legitimate firearms expert in a death penalty case where the only evidence linking the defendant to the crimes was ballistics testing from a firearm.  Id. at 1083-1087.  The attorney's ignorance of the law in Hinton went to the fundamental issue of the case.  In Morganti and Alebord, there was no evidence that the court room closure was fundamental to the defendants' receipt of a fair trial.  The same is true in this case.

tending to show that closure of the court room during empanelment may have had "an 'effect on the judgment,' or undermine[d] our 'reliance on the outcome of the proceeding.'" LaChance, supra at 859, quoting Strickland v. Washington, 466 U.S. 668, 691, 692 (1984). Nor do we find such evidence on independent review. The defendant's Sixth Amendment public trial claim therefore is waived, and his claim of ineffective assistance of counsel for waiving his Sixth Amendment right fails.

Conclusion. For the reasons discussed in this opinion, we conclude as follows. With respect to the defendant's direct appeal, the convictions of murder in the first degree and armed assault with intent to murder are affirmed. With respect to the defendant's appeal from the order denying his second motion for a new trial, that order is affirmed. Finally, with respect to the defendant's appeal from the order denying his first motion for a new trial, that order is vacated, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.