CYPHER, J.
**861 A jury convicted the defendant, Wally Jacques Simon, of murder in the first degree on a theory of felony-murder **862 for the killing of Christopher Barbaro (Christopher).[1] We consolidated the defendant's direct appeal with his appeal from the denial of his motion for a new trial. On appeal, the defendant contends that he received ineffective assistance of counsel; the prosecutor improperly shifted the burden of proof during cross-examination of a witness for the defendant; and the double jeopardy clause of the Fifth Amendment to the United States Constitution was violated when he was convicted of and sentenced for felony-murder as well as the predicate offenses of armed home invasion and armed robbery.
For the reasons stated infra, we vacate the defendant's underlying felony conviction of armed robbery as duplicative, affirm the defendant's remaining convictions, and affirm the denial of the defendant's motion for a new trial. After a thorough review of the record, we also decline to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to reduce or set aside the verdict of murder in the first degree.
1. Background. We summarize the facts that the jury could have found, reserving pertinent facts for the discussion of the defendant's arguments. On October 24, 2007, at approximately 12:30 A.M. , Christopher's brother, Bryan Barbaro (Bryan),[2] heard loud bangs and "some fumbling around" in the apartment below his own. The apartment was occupied by Christopher. Bryan went downstairs to investigate the loud noises and found his brother on the ground "flailing ... trying to get air." Bryan went to call for help, but was confronted by the defendant who was attempting to leave the apartment with a *683 bag of money and rare coins.[3] The defendant shot Bryan and a struggle ensued. During the struggle, the bag carrying the coins ripped open and coins scattered on the floor. The defendant fled the scene in a dark sport utility vehicle (SUV).
Bryan and Christopher had been friends of the defendant. Bryan had met the defendant at a local gym where the defendant exercised, and periodically, the defendant had worked for Bryan's construction company. Bryan had introduced the defendant to Christopher, and eventually, the defendant had supplied marijuana **863 to Christopher, who was a marijuana dealer. Bryan testified that he had known the defendant for about seven years.[4] The defendant also had been to Bryan and Christopher's residence.
After the defendant fled, Bryan went to his apartment to call 911. During the telephone conversation with the emergency dispatcher, Bryan stated that he recognized the assailant as "Wally," who worked out at a local gym. He also recounted the events of the shooting, gave a physical description of the assailant, and described the vehicle he drove -- a black SUV.
When police arrived, they observed a twenty dollar bill on the street in front of the house. Inside the house, police noticed coin books and various paper currency scattered on the stairway leading up to the second floor. The lock to the door of Christopher's apartment was broken. Inside his apartment, police found Christopher dead from a gunshot wound to the head. There were multiple spent .25 caliber shell casings on the floor. On the third floor, police discovered Bryan lying on the couch with a gunshot wound to the chest. He was slipping in and out of consciousness. Bryan reiterated to the responding officers that Wally was the shooter.
Police immediately obtained the defendant's address from the local gym, located the defendant, and began to surveil him. The defendant was driving a dark SUV. Police followed the defendant to downtown Boston and approached him once he got out of his vehicle. Trooper Michael Banks of the State police stated that he wanted to talk to the defendant and pat frisked him while other officers stood nearby on the sidewalk. The defendant responded that he was speaking with his attorney on his cellular telephone (cell phone) and did not want to talk to police until meeting with his attorney.[5] Soon thereafter, attorney Daniel Solomon came out **864 to the street and approached the officers.[6] Banks said to Solomon, "There was an incident in Winchester last night, and we want to talk to [the defendant] about it." Solomon informed Banks that he and the defendant would return to his office and that Solomon would notify police whether the defendant would speak with them. Banks *684 gave Solomon his cell phone number, and waited with the other five or six officers downstairs for approximately one hour.
While waiting for Solomon to confer with the defendant, Banks received a telephone call from another trooper who had spoken with Bryan at the hospital. Bryan was shown a photographic array and identified the defendant as the man in his brother's apartment. Upon receiving this information, Banks telephoned Solomon to ask if the defendant would be willing to speak with them. Solomon consented, and the defendant, with Solomon present, proceeded to talk with Detective Paul DeLuca and Trooper Scott McCormack. Police did not give the defendant Miranda warnings prior to or during their questioning.
At the outset of the interview, McCormack stated that a double shooting and home invasion had taken place in Winchester the previous night, that one of the victims had died, and that the surviving victim had identified the defendant from a photographic array. McCormack then asked the defendant if he knew anyone in Winchester and where he had been the previous night. In response, the defendant said that he had known Bryan for several years and that they had met at the local gym. The defendant also said that he had worked for Bryan and knew Christopher through Bryan. In addition, the defendant provided an alibi for his whereabouts the previous night. He claimed that he was home watching a televised boxing event, and then went to his friend Dolores Mazil's home in Lynn before returning home to sleep. Before police could ask another question, Solomon advised the defendant not to say anything else. The interview lasted approximately five to ten minutes. The defendant was then arrested.
The next day, the defendant repeatedly telephoned an acquaintance, Anunzie Viel, who resided with Dolores in Lynn. Neither Mazil nor Viel could corroborate the defendant's alibi.[7]
**865 After arresting the defendant, police searched his SUV and his home. In the defendant's SUV, police discovered a coin consistent with the types of coins Christopher collected. A search of the defendant's home produced a .25 caliber bullet in his top dresser drawer -- the same caliber as the gun that killed Christopher and injured Bryan. Police also discovered $ 1,000 in cash in the defendant's spouse's home.
2. Procedural history. Prior to trial, the defendant filed a motion to suppress the statements he made to police during his interview because he never received a Miranda warning.[8] The motion judge denied the motion, and the defendant sought an interlocutory appeal, which a single justice reported to this court. We affirmed the motion judge's decision and concluded, inter alia, that although the defendant was in custody and police did not give him the *685 Miranda warnings prior to conducting the interview, the presence of the defendant's attorney during police questioning, coupled with the fact that the defendant had an opportunity to consult with counsel before the questioning, substituted adequately for the giving of the Miranda warnings. Commonwealth v. Simon, 456 Mass. 280, 289, 923 N.E.2d 58, cert. denied, 562 U.S. 874, 131 S.Ct. 181, 178 L.Ed.2d 108 (2010) ( Simon I ). The defendant did not raise, and this court did not address, whether Solomon was ineffective for advising the defendant to speak with police without having conducted any factual investigation into the severity of the allegations against the defendant.
Following a jury trial, the defendant was convicted of murder in the first degree on a theory of felony-murder. In June 2016, the defendant filed a motion for a new trial. The motion was supported by his own affidavit and an affidavit from Solomon. In Solomon's affidavit, he testified that before conducting the interview with police he "asked the defendant repeatedly whether he **866 knew why [police] were there and whether he 'did anything.' " Solomon claimed that the defendant "repeatedly and vociferously denied" any knowledge why police wanted to question him. Furthermore, Solomon stated: "During my meeting alone with the defendant, at no time did I go over his Miranda rights or his right to remain silent." Following a nonevidentiary hearing, the motion judge, who was also the trial judge, denied the defendant's motion. The motion judge presumed "for purposes of this decision only" that Solomon's conduct of conferring with the defendant and permitting him to speak with police fell measurably below that which might be expected from an ordinary fallible lawyer. The motion judge concluded, however, that Solomon's conduct did not deprive the defendant of an otherwise available, substantial ground of defense.
3. Discussion. a. Ineffective assistance of counsel. In his appeal from the denial of his motion for a new trial, the defendant contends that Solomon, who did not represent him at trial but was present during the police interview, was ineffective. The defendant contends that Solomon allowed him to confer with officers without first conducting an investigation into the allegations.
Generally, to establish ineffective assistance of counsel, the defendant bears the burden of showing "that there has been a 'serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer,' and that counsel's poor performance 'likely deprived the defendant of an otherwise available, substantial ground of defence.' " Commonwealth v. Millien, 474 Mass. 417, 429-430, 50 N.E.3d 808 (2016), quoting Commonwealth v. Saferian, 366 Mass. 89, 96, 315 N.E.2d 878 (1974). In reviewing the judge's denial of the defendant's motion for a new trial, we look to see whether the judge committed "a significant error of law or other abuse of discretion." Commonwealth v. Duart, 477 Mass. 630, 634, 82 N.E.3d 1002 (2017), cert. denied, --- U.S. ----, 138 S.Ct. 1561, 200 L.Ed.2d 755 (2018), quoting Commonwealth v. Forte, 469 Mass. 469, 488, 14 N.E.3d 900 (2014). We show particular "deference to the action of a motion judge who was also the trial judge." Commonwealth v. Grace, 397 Mass. 303, 307, 491 N.E.2d 246 (1986).
In the context of a case of murder in the first degree, we consider whether error, if any, created a substantial likelihood of a miscarriage of justice. To show that Solomon's actions created a substantial likelihood of a miscarriage of justice, the defendant must satisfy two prongs: (1)
*686 that counsel's erroneous legal advice **867 caused the defendant to give his statement to police; and (2) that the defendant's statement likely influenced the jury's conclusion. See Commonwealth v. Celester, 473 Mass. 553, 572, 45 N.E.3d 539 (2016). Under this more favorable standard of review, we consider a defendant's claim even if the action by trial counsel does not "constitute conduct falling 'measurably below' that of an 'ordinary fallible lawyer' " (citation omitted). Commonwealth v. Williams, 453 Mass. 203, 205, 900 N.E.2d 871 (2009).
The defendant predominantly relies on our decision in Celester. The defendant in Celester had been arrested for murder and was given Miranda warnings. His attorney, however, had not conducted any factual investigation into the allegation against his client before advising him to speak with police. Celester, 473 Mass. at 565, 45 N.E.3d 539. The attorney instructed the defendant, "[T]ell [police] what you told me," at which point the defendant made inculpatory statements during his police interview. Id. In Celester, we recognized that a person's right to speak with counsel is not "actualize[d] or substantively meaningful if counsel fails to provide at least minimally competent advice" and that counsel has "an obligation at the very least to discuss with his client the self-incrimination privilege and the potential consequences of giving a statement to the police" (quotations and citation omitted). Id. at 568, 571, 45 N.E.3d 539. We agreed with the defendant's contention that his attorney "provided ineffective assistance by instructing or advising him [ (without conducting an investigation) ] to make a statement to police that had an inculpatory effect." Id. at 569-570, 45 N.E.3d 539. Moreover, we concluded that the defendant's statement likely influenced the jury's verdict. Id. at 573, 45 N.E.3d 539.
The record in this case shows that Solomon advised the defendant to speak with police, or at least acquiesced to police's request to speak with the defendant, after consulting with him for approximately forty-five minutes to an hour. Furthermore, Solomon testified in his affidavit that he did not inform the defendant of his Miranda rights prior to allowing officers to interview him. Although the defendant's statements to police were exculpatory in nature, Solomon's conduct of allowing police to interview the defendant without fully understanding the allegations against his client and without informing his client of his Miranda rights caused the defendant to give his statement to police.[9] See Celester, 473 Mass. at 571 & n.23, 45 N.E.3d 539 ("before affirmatively advising **868 a client to speak about the case to the police, it is necessary for counsel to undertake some investigation of the charge and the government's evidence"; counsel has "obligation at the very least to discuss with his client the self-incrimination privilege and the potential consequences of giving a statement to the police"). See also Watts v. Indiana, 338 U.S. 49, 59, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (Jackson, J., concurring) ("any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances"). Cf. Simon I, 456 Mass. at 289, 923 N.E.2d 58. *687 Having satisfied the first prong, the defendant must establish that the jury were likely to have been influenced by the defendant's statement to police. The facts of this case depart significantly from Celester when considering prejudice. In Celester, 473 Mass. at 573, 45 N.E.3d 539, we concluded that the defendant's statement to police "placed him directly at the scene of the crime at the exact time the crime was committed ... [and] strongly reinforc[ed] [a percipient witness's] trial testimony." The defendant's statement that flowed from counsel's erroneous legal advice certainly influenced the jury's conclusion. Id.
Here, the defendant made two statements during his police interview that the jury ultimately heard. First, the defendant admitted that he knew Christopher and Bryan. Second, the defendant stated that on the night of the killing he was at his friend's house in Lynn before returning home to sleep. Unlike the defendant's statements in Celester, these two statements did not inculpate the defendant in the murder. Contrast Celester, 473 Mass. at 573, 45 N.E.3d 539. Moreover, the information gathered from the defendant's statement to police also was admitted through other sources at trial. For example, Bryan's 911 call was played for the jury. During the call, Bryan described his relationship with the defendant and identified him as the shooter. Bryan's grand jury testimony was also read in evidence, in which he testified extensively about his seven-year relationship with the defendant and that the defendant was involved in dealing marijuana with Christopher.
In addition, the jury heard about the defendant's purported alibi through the testimony of Viel. Specifically, Viel testified that she had several telephone conversations with the defendant starting on the morning following the shooting and that the defendant was not with her the night of the shooting. The jury also heard Viel **869 being impeached with her grand jury testimony, in which she stated that the defendant had asked her to provide a false alibi for the evening of the shootings.[10] Furthermore, Mazil testified that the defendant had not been with her the night of the shooting. The defendant's cell phone records also were admitted in evidence through his former spouse's testimony. The cell phone records showed that the defendant placed multiple calls to Viel and Mazil hours after the shooting. The jury reasonably could infer that the defendant was calling Viel and Mazil to ask them to corroborate his alibi.
There were independent sources apart from the defendant's statement to police that established the defendant's relationship with the brothers and that the defendant gave a false alibi. Moreover, the defendant's statement to police was exculpatory in nature and did not tie him to the scene of the crime. Cf. Celester, 473 Mass. at 573, 45 N.E.3d 539. Therefore, we conclude that the defendant's statements were unlikely to have influenced the jury's conclusion.
b. Burden shifting. The defendant argues that the Commonwealth engaged in impermissible burden shifting by suggesting that the defendant and Solomon had a duty to obtain or preserve evidence during the police interview in Solomon's conference room. Specifically, the defendant suggests that the prosecutor impermissibly questioned Solomon about his recording capabilities and whether he ever asked police to bring a tape recorder to the *688 interview. The defendant contends that this error was reinforced when the prosecutor restated during his closing argument that Solomon and the defendant did not request the police interview to be recorded.[11] Neither the contested cross-examination nor the closing argument was objected to at trial. Therefore, we review error, if any, for a substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 682, 584 N.E.2d 621 (1992), S.C., 469 Mass. 447, 14 N.E.3d 294 (2014).
"[A] prosecutor shifts the burden of proof when, for example, he or she calls the jury's attention to the defendant's failure to call a witness or witnesses, or when the prosecutor offers 'direct comment **870 on a defendant's failure to contradict testimony.' " Commonwealth v. Tu Trinh, 458 Mass. 776, 787, 940 N.E.2d 871 (2011), quoting Commonwealth v. Miranda, 458 Mass. 100, 117, 934 N.E.2d 222 (2010), cert. denied, 565 U.S. 1013, 132 S.Ct. 548, 181 L.Ed.2d 396 (2011). In such cases, the prosecution lessens the Commonwealth's burden of proof by signaling to the jury that the defendant has an affirmative duty to present evidence of his or her innocence. Tu Trinh, supra."It is not improper," however, "for counsel to respond to arguments raised by the defense, and to make an argument presented by way of reasonable inferences that could be drawn from the evidence" (citations omitted). Miranda, supra at 116, 934 N.E.2d 222. Furthermore, it is "permissible for the prosecution to address any reasons or justifications that would explain why no recording was made, leaving it to the jury to assess what weight they should give to the lack of a recording." Commonwealth v. DiGiambattista, 442 Mass. 423, 448-449, 813 N.E.2d 516 (2004). While it is preferable that a recording be made "whenever practicable," we have said that, where no such recording is made, "the defendant is entitled (on request) to a jury instruction ... cautioning the jury that, because of the absence of any recording of the [interview] in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care." Id. at 447-448, 813 N.E.2d 516.
Here, although the defendant claims error in the Commonwealth's questioning, the Commonwealth initially did not raise the issue whether Solomon had recording capabilities in his office. During cross-examination of an arresting officer, defense counsel asked whether recording an interview is an "optimal" police procedure and questioned the officer about why he did not attempt to record the interview with the defendant, and whether he had asked if Solomon himself had a recording device before or during the interview. Each Commonwealth witness present at the interview was asked by defense counsel if it is necessary for police to record a defendant's interview, whether they had an opportunity to record this specific interview, and why they did not take further action in order to record the interview.[12] In response, the Commonwealth properly questioned its witnesses about recording the interview. During the cross-examination of Solomon, which the defendant specifically challenges here, the Commonwealth asked why he did not make efforts to have the interview **871 recorded. Solomon *689 confirmed that he was aware that it was an option to record the interview but that he did not have a recording device present, nor did he request to have the interview recorded.
The recording capabilities available at the attorney's office are relevant to why no recording existed. The Commonwealth did not shift the burden of proof onto the defendant; it instead addressed why no recording of the interview was made in response to arguments raised by the defense. The Commonwealth properly responded by presenting reasonable inferences drawn from the evidence, see Miranda, 458 Mass. at 116, 934 N.E.2d 222, including justifications that explained why no recording was made, see DiGiambattista, 442 Mass. at 448-449, 813 N.E.2d 516.
Further, during trial, the judge gave jury instructions regarding the Commonwealth's burden of proof. The judge informed the jury that the "burden of proof never shifts. The defendant is not required to call any witnesses or produce any evidence since he is presumed to be innocent." Where the jury are instructed on the burden of proof and there is nothing to suggest that they did not otherwise heed the instruction, we must assume that they did. See Commonwealth v. Stanley, 363 Mass. 102, 105, 292 N.E.2d 694 (1973). Moreover, the judge instructed the jury about the absence of a recorded interview. The judge stated that this court has "expressed a preference that such interrogations be recorded whenever practicable. Here, where there is no videotape or audiotape recording of this interrogation, you should weigh evidence of the defendant's alleged statement with caution and care." See DiGiambattista, 442 Mass. at 447-448, 813 N.E.2d 516. There was no error.
c. Double jeopardy. The defendant argues that, as he was convicted of felony-murder in the first degree with the predicate offenses of both armed robbery and armed home invasion, a conviction on all three counts violates the double jeopardy clause of the Fifth Amendment and art. 12 of the Massachusetts Declaration of Rights. The defendant is correct, and the Commonwealth concedes that a conviction on an underlying felony is duplicative of a felony-murder conviction, and that the underlying felony must accordingly be vacated. See, e.g., Commonwealth v. Lucien, 440 Mass. 658, 673-674, 801 N.E.2d 247 (2004). This is not cause, however, to overturn the defendant's convictions.
"When a murder conviction is based on a felony-murder theory, the underlying felony, whatever it may be, is always a lesser included offense and the conviction for that felony, in addition to the conviction of murder, is duplicative."
**872 Commonwealth v. Gunter, 427 Mass. 259, 276, 692 N.E.2d 515 (1998), citing Commonwealth v. Mello, 420 Mass. 375, 398, 649 N.E.2d 1106 (1995). The appropriate remedy, then, "is to vacate both the conviction and the sentence on that [predicate] felony." Gunter, supra at 275, 692 N.E.2d 515. That is the case when there is only one underlying felony upon which a defendant is convicted. See, e.g., Commonwealth v. Alcequiecz, 465 Mass. 557, 558, 989 N.E.2d 473 (2013) (felony-murder and armed burglary duplicative such that armed burglary must be vacated); Gunter, supra at 276, 692 N.E.2d 515 (conviction of armed assault in dwelling vacated as duplicative where it served as predicate offense for felony-murder).
Here, jurors specifically found the predicate offenses to be both armed robbery and armed home invasion. In Commonwealth v. Rasmusen, 444 Mass. 657, 666, 830 N.E.2d 1040 (2005), we addressed a similar issue where the defendant was *690 convicted of felony-murder on two underlying felonies. There, while either felony could have served as the underlying offense, our analysis determined which offense was "better suited to serve as the predicate felony." Id. at 667, 830 N.E.2d 1040. The facts of that case more closely connected the defendant's armed burglary conviction to the victim's murder, while the home invasion conviction was considered independent of the murder in those circumstances. Id. at 666-667, 830 N.E.2d 1040. We vacated the defendant's conviction of and sentence for armed burglary as duplicative of his felony-murder conviction while the home invasion conviction and sentence remained. Id. at 667, 830 N.E.2d 1040. See Commonwealth v. Bin, 480 Mass. 665, 666 n.2, 107 N.E.3d 1146 (2018), citing Rasmusen, supra at 666-667, 830 N.E.2d 1040 (reinstatement of defendant's armed home invasion conviction was appropriate while attempted armed robbery conviction properly should have been vacated as duplicative).
Applying a similar factual analysis here, we determine that the defendant's armed robbery conviction is more closely related to Christopher's murder and is thus the only conviction that should be vacated as the underlying felony.[13]
4. Conclusion. For the above reasons, we vacate the defendant's underlying felony conviction of armed robbery and affirm **873 the remaining convictions. We also affirm the order denying the defendant's motion for a new trial. Furthermore, we have reviewed the record in its entirety and see no basis to grant extraordinary relief under G. L. c. 278, § 33E.
So ordered.

The defendant was also convicted of armed robbery, armed home invasion, assault and battery by means of a dangerous weapon, and carrying a firearm without a license.

We refer to the victims by their first names for the sake of clarity.

The victim had an extensive coin collection that he kept in a safe in his apartment.

Prior to trial, Bryan passed away from an unrelated illness. His grand jury testimony was read into the record at trial. Both the prosecution and defense agreed in a joint motion to admit the complete grand jury testimony and the entirety of Bryan's 911 call. The defendant was subjected to a colloquy with the judge to ensure that he understood that his attorney strategically chose to allow what normally would have been inadmissible hearsay.

At trial, the jury were informed that the defendant had arranged an appointment with his attorney, Daniel Solomon, a few days prior to discuss another criminal matter. The jury also heard that Solomon worked on a wide range of civil cases, including construction matters.

Solomon did not represent the defendant at trial; he testified on behalf of the defendant as to what took place during his interview with the defendant in his office.

At trial, Anunzie Viel testified that the defendant had not telephoned her to request that she provide him with a false alibi. She previously had testified before the grand jury that he had asked her to provide an alibi. Viel stated that her inconsistency was a result of police pressure regarding another open criminal case.

The defendant also sought to exclude testimonial hearsay from Bryan's 911 call. The trial judge denied defendant's motion to exclude the 911 call and grand jury testimony and reported his decision to the Appeals Court. We transferred the case to this court on our own motion, consolidated it with the defendant's interlocutory appeal from the denial of his motion to suppress, and affirmed in part the judge's decision. Commonwealth v. Simon, 456 Mass. 280, 295-301, 923 N.E.2d 58, cert. denied, 562 U.S. 874, 131 S.Ct. 181, 178 L.Ed.2d 108 (2010). Ultimately, the 911 call and Bryan's grand jury testimony were admitted in evidence at trial via a joint motion. See note 4, supra.

At trial, Solomon testified that he did not speak substantively with police prior to the interview. He stated that he did not ask them any questions because he did not think that they would tell him anything. He claims that they hovered outside his office while he was talking with the defendant, so he invited officers into his conference room to better understand what was occurring.

Viel testified at trial that she had made that statement to the grand jury because she was "on bond from [a] federal charge. And an officer was threatening ... [her] that if [she did not] say this that he was gonna make [her] time even worse."

The prosecutor argued, "And you heard me ask [Solomon], did you have a recording device in your office? No. Did you ask for this conversation to be recorded? ... Absolutely not."

On more than one occasion, defense counsel asked officers why they did not go to a nearby office supply store to purchase a recording device prior to the interview.

The defendant broke into the second-floor apartment where Christopher lived, took money and rare coins from his safe, and shot Christopher in the head. Bryan did not become involved until he heard noises coming from the downstairs apartment. The armed robbery conviction, arising from the taking of cash and coins from Christopher's apartment, is more directly related to his murder than the armed home invasion, which also relates to the defendant's confrontation with Bryan. As such, the defendant's armed robbery conviction is "better suited" to serve as the predicate offense. Commonwealth v. Rasmusen, 444 Mass. 657, 667, 830 N.E.2d 1040 (2005).