NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13574

COMMONWEALTH  vs.  JAMES W. FERGUSON.

Plymouth.     November 10, 2025. – March 6, 2026.

Present:  Budd, C.J., Gaziano, Wendlandt, Georges,
& Wolohojian, JJ.


Homicide.  Felony-Murder Rule.  Firearms.  Burglary.  Robbery.
    Joint Enterprise.  Practice, Criminal, Instructions to
    jury, Argument by prosecutor, Mistrial, Duplicative
    convictions, Capital case.  Malice.  Evidence, Argument by
    prosecutor, Inference, Joint venturer.  Cellular Telephone.
    License.


Indictments found and returned in the Superior Court
Department on November 24, 2015.

The cases were tried before Cornelius J. Moriarty, II, J.


Michael Tumposky for the defendant.
Arne Hantson, Assistant District Attorney, for the
Commonwealth.


GAZIANO, J.  The defendant, James W. Ferguson, was

convicted of thirteen charges, including murder in the first

degree for the killing of the victim, Robert McKenna.  According

to the Commonwealth, the defendant and two coventurers broke

into the victim's house to steal marijuana and other valuables. The robbery turned violent, and the victim was beaten to death. At trial, defense counsel argued that the plan, formed by another coventurer, was to take the valuables without hurting anyone and that, after the plan went awry, the defendant was not present when the victim sustained fatal injuries.

The defendant raises the following claims on appeal: (1) the judge erred by not providing a jury instruction on involuntary manslaughter; (2) the judge abused his discretion in denying the defendant's motion for a mistrial, where the Commonwealth made several improper and prejudicial statements during closing argument; (3) the defendant's five convictions of unlawful possession of a firearm should be vacated under Commonwealth v. Guardado, 491 Mass. 666, 690 (Guardado I), S.C., 493 Mass. 1 (2023) (Guardado II), cert. denied, 144 S. Ct. 2683 (2024); and (4) either the defendant's aggravated burglary or unarmed robbery conviction must be vacated as duplicative of his felony-murder conviction. The defendant also asks us to exercise our extraordinary authority under G. L. c. 278, § 33E (§ 33E), to reduce his felony-murder conviction to murder in the second degree or involuntary manslaughter.

After considering the defendant's claims, we conclude that the judge neither erred in declining to instruct the jury on involuntary manslaughter nor abused his discretion in denying

the defendant's motion for a mistrial.  Further, having carefully conducted an independent review of the entire record, we decline to grant relief under § 33E.  However, as the Commonwealth did not prove absence of licensure, we vacate the defendant's unlawful firearm possession convictions and remand for a new trial on those charges.  Additionally, we vacate the defendant's conviction of aggravated burglary as duplicative of the felony-murder conviction.  We affirm the defendant's remaining convictions, including his conviction of murder in the first degree.

1.  Background.  a.  Facts.  The following facts are supported by the evidence presented at trial.

The victim, Robert McKenna, was a retired stockbroker who lived alone in a ranch-style house on Damons Point Road in Marshfield with his two dogs.  Inside the basement, the victim operated a substantial marijuana "grow room" where he cultivated between twenty and forty marijuana plants.  In the attic crawl space above the garage and the closet of the victim's bedroom, the victim housed a substantial collection of firearms, including an AK-47, an AR-15, and antique rifles.

Thomas Gunning, who met the victim through a mutual friend, visited the victim's house nearly a dozen times between the summer of 2014 and May 2015.  During this time, Gunning purchased drugs from one of the defendant's coventurers, Michael

Moscaritolo. When Gunning first saw the victim's marijuana grow operation, he took a picture of it and sent it to a group of friends, which included Moscaritolo. Gunning also took several pictures of the victim's firearms and sent them to friends, including Brianne St. Peter, a friend of Moscaritolo. Moscaritolo took a keen interest in the victim's valuables. After questioning Gunning, Moscaritolo learned the victim's name and address. He also learned the layout of the victim's house after Gunning drew a diagram of the house at Moscaritolo's request. In July 2015, Moscaritolo asked Gunning whether the victim owned a crossbow, because he wanted to make sure that he would not get shot if he went to the victim's house to take his marijuana.

Moscaritolo was the defendant's former lawyer and acquaintance. On September 12, 2015, the defendant received a telephone call from Moscaritolo. Audra Romani was the defendant's then girlfriend and was with the defendant when he received the call from Moscaritolo. She recalled that Moscaritolo had proposed robbing someone in Marshfield who had marijuana plants and "a lot of money," where "the basic plan was to have three guys go to the rich guy's house, have two guys distract the victim while the third guy went through the house." Additionally, according to Romani, Moscaritolo told the

5

defendant that "there was a drug addict or a heroin addict in Marshfield who was rich and that no one would get hurt."

Three days later, in the afternoon of September 15, 2015, Mark O'Brien, the other coventurer, drove the defendant to a home improvement store and an electronics store in O'Brien's gray Isuzu Rodeo sport utility vehicle (SUV). Later that day, at around 9 P.M., the defendant's roommate observed O'Brien picking up the defendant in his Isuzu Rodeo SUV.

On September 16, 2015, at around 1 A.M., one of the victim's neighbors awoke to the sound of glass breaking. At 3 A.M., the same neighbor again was roused, this time by a large shattering glass sound and dogs barking. She heard the voices of three or four men arguing and then saw a man enter a black or dark-colored car before it left the victim's driveway. The neighbor and her roommate went over to the victim's house to investigate but found nothing amiss from the outside.

Another neighbor was awoken at 1 A.M. that morning by his dog. He looked out the window but saw nothing suspicious. He was awoken again just after 3 A.M., this time by the sounds of dogs barking from inside the victim's house. As he looked out the window, the neighbor saw a man leaving the victim's house holding what appeared to be a rolled-up bag and a flashlight. He also noticed a black car not belonging to the victim parked in the victim's driveway.

At around 3:30 P.M. on September 16, 2015, Kevin Costello, the victim's childhood friend, came to the victim's house for a planned visit. Walking around the back of the house, Costello discovered that the guest room window was broken and found blood on the window, on the patio, and inside of the guest room. Upon entering the house through a rear door, Costello saw blood everywhere, including on the ceiling and on the walls. The victim's two dogs, both covered in dried blood, ran over to Costello as he entered the house. He then discovered the victim lying face-up on the kitchen floor, covered in blood. Costello called 911, and first responders declared the victim dead shortly thereafter.

An autopsy of the victim revealed lacerations to his forehead and the back of his scalp; other blunt force injuries to his face; contusions and abrasions on his head, face, chest, back, abdomen, legs, and arms; and a deep incision into his underarm that was four and one-quarter inches in length and two inches deep. The incision transected the brachial artery, the primary source of blood flow through the arm. The medical examiner testified that the victim sustained many of these injuries -- including the lacerations to his head -- before his death. The medical examiner determined that the cause of death was exsanguination -- loss of blood -- due to "two major

clusters of injuries": the incision transecting the brachial artery and the lacerations to the scalp.

The house displayed signs of struggle. Investigators found blood throughout the house, including on the cabinets, countertop, floors, walls, ceilings, hallways, and furniture. There was glass from the broken window on the guest room floor and the patio. In the master bedroom, one of the drawers had been removed from a bloodstained chest of drawers, a bloodstained bedside stool had been turned on its side, and multiple guns and shotgun shells were found on the floor. In the living room, investigators discovered a purple latex glove stained with blood. The profile of a deoxyribonucleic acid (DNA) sample recovered from the glove's interior -- i.e., DNA that would have been left by the glove's wearer -- matched that of Moscaritolo. Investigators also discovered that five firearms were missing from the victim's collection.

A blue frying pan was also found on the floor of the master bedroom. The frying pan was visibly dented and had bloodstains on its interior, underside, and handle. The medical examiner classified the frying pan as a blunt force object, and the lacerations on the victim's scalp as blunt force trauma.

Outside of the victim's house, investigators recovered a black flashlight. Both the victim and Moscaritolo were included as potential contributors to DNA found on the flashlight. A

black and gold work glove was located in the area near the victim's house.  The work glove was stained with the victim's blood, and DNA profiles developed from swabs of the glove matched DNA profiles from the victim, Moscaritolo, and the defendant.  Along Route 3A in Marshfield, approximately two miles from the victim's house, investigators found a pair of white Nike Air Max sneakers.  The sole of the left sneaker was stained with the victim's blood.  Additionally, a DNA profile developed from a wearer sample taken from the interior of the right sneaker matched Moscaritolo's DNA profile.  Investigators also discovered alongside Route 3A a pair of camouflage shorts, a camouflage jacket, and a blue long-sleeved T-shirt that were all stained with the victim's blood.  The shirt had the victim's bloodstains saturated through the fabric.  The DNA profile of the shirt's wearer -- developed from a sample recovered from the unstained areas around the collar and armpits of the shirt -- matched that of the defendant.

Three sets of treaded footwear impressions and one set of bare foot impressions were found in the bloodstains throughout the victim's house.  One treaded impression was identified as belonging to Nike Air Max sneakers.[1]  A footwear analysis

---

[1] The shoes that made the other two impressions were never recovered.  Shoes that were recovered from the defendant's house during the course of the investigation were excluded as being the source of any of the three treaded impressions.

revealed that the Nike Air Max sneakers recovered alongside Route 3A matched this impression in class characteristics, size, wear characteristics, and identifying characteristics.

A search of the defendant's cell phone records showed that the defendant had been in contact with both O'Brien and Moscaritolo from September 15 to 16.  The defendant received calls from O'Brien on September 15, 2015, at 9:12 P.M. and 9:15 P.M.  The defendant called Moscaritolo at 9:31 P.M. and 10:03 P.M.  The last recorded activity from the defendant's cell phone before it was disconnected from the network was a call to Moscaritolo at 11:01 P.M.  Between 12:47 A.M. and 4:13 A.M. on September 16, all three coventurers' cell phones were disconnected from the cellular network.

Cell site location information (CSLI) revealed that the defendant's cell phone connected to a cell tower near South Boston at 9:12 P.M on September 15.  The defendant's cell phone proceeded to move south that evening.  At around 11 P.M., the defendant's cell phone connected to a cell tower in an area around Marshfield, Plymouth, and Kingston before disconnecting from the network.  Between 12:01 A.M. and 12:45 A.M. on September 16, Moscaritolo's cell phone connected to a cell tower in Marshfield.  The defendant's cell phone reconnected to the network at 4:39 A.M. to a tower in Marshfield.  The defendant's

cell phone then moved north, away from Marshfield and back to the South Boston area, between 4:39 A.M. and 6:15 A.M.

In the afternoon of September 16, Lauren Kalil, Moscaritolo's then girlfriend, observed a silver SUV park in the lot across the street from her Quincy house, where Moscaritolo had been living with her on the third floor. Kalil recognized the defendant as he got out of the SUV. She also saw a man get out of the vehicle whom she later identified as O'Brien. According to Kalil, the defendant opened the SUV's rear hatch, revealing a large bag in the trunk. The defendant, O'Brien, and Moscaritolo proceeded to have a conversation outside of the house for about thirty minutes.

On around September 18, St. Peter and her friend drove a truck belonging to St. Peter's then husband Shane McMahon to Kalil's house, where St. Peter picked up a bag from Moscaritolo. Later finding the truck parked in his driveway, McMahon opened the toolbox in the bed of his truck and discovered a green duffel bag containing multiple firearms. Kalil testified that Moscaritolo told St. Peter "not to register the guns . . . because they were stolen . . . [f]rom Damons Point."

On October 7, investigators accompanied St. Peter and McMahon to the residence of St. Peter's mother. There, they discovered five firearms hidden in a crawl space. Bloodstains were found on all five firearms. A DNA profile generated from a

sample recovered from one of the firearms matched that of the victim.

After learning of the killing on the news, Romani said to the defendant, "Please don't tell me this had anything to do with you." The defendant had a blank expression and said nothing in response. Romani then said, "I thought no one was supposed to get hurt." Again, the defendant did not answer.

When investigators searched Kalil's residence pursuant to a search warrant on October 1, they discovered two purple latex gloves. Kalil's mother worked at a hospital and would often bring home purple latex gloves. These latex gloves were of the same make, manufacture, and type as the one found at the victim's house.

On October 2, during the execution of a search warrant on O'Brien's Isuzu Rodeo SUV, investigators discovered that the interior of the vehicle was clean, the dashboard was free of dust, and there were no floor mats in the vehicle. In the rear of the vehicle, investigators found a bottle of cleaner and a pair of black and yellow work gloves. The bottom and back of the driver's seat tested positive for occult blood.

Between September and November 2015, police arrested the defendant, Moscaritolo, and O'Brien.

b. Procedural history. On November 24, 2015, a Plymouth County grand jury returned thirteen indictments against the

defendant, charging him with murder in the first degree, in violation of G. L. c. 265, § 1; aggravated burglary (assault on occupant), in violation of G. L. c. 266, § 14; unarmed robbery, in violation of G. L. c. 265, § 19 (b); five counts of larceny of a firearm, in violation of G. L. c. 266, § 30; and five counts of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (a).

In November 2019, a jury trial commenced in the Superior Court. The judge denied the defendant's request for an involuntary manslaughter jury instruction as well as the defendant's motion for a mistrial based on purportedly improper remarks made by the prosecutor during closing argument. In December 2019, following sixteen days of trial, the defendant was convicted of murder in the first degree on a theory of felony-murder, with aggravated burglary and unarmed robbery having been presented to the jury as the predicate offenses. The defendant was also convicted of the remaining twelve charges.[2] The defendant timely appealed.

---

[2] Moscaritolo and O'Brien were separately tried and likewise convicted on nearly identical charges, including murder in the first degree. Moscaritolo was not convicted of any unlawful possession charges. With the exception of O'Brien's convictions of unlawful possession of a firearm, which were vacated and subject to new trials pursuant to Guardado II, 493 Mass. at 12, his convictions were affirmed by this court. Commonwealth v. O'Brien, 494 Mass. 288, 303-304 (2024). In Commonwealth v. Moscaritolo, 497 Mass.    (2026), also issued today, we affirm Moscaritolo's convictions.

2.  <u>Discussion</u>.  The defendant argues on appeal that the trial judge erroneously denied his request for an involuntary manslaughter instruction because there were multiple views of the evidence that would have supported a verdict of involuntary manslaughter and not murder.  He also argues that the Commonwealth made several improper and prejudicial statements during closing argument that should have warranted a mistrial, that his five firearm convictions must be vacated given that the Commonwealth did not prove that he lacked a license to carry a firearm, and that either the aggravated burglary or unarmed robbery conviction must be vacated as duplicative of the felony-murder conviction.  Finally, the defendant asks us to exercise our extraordinary authority under § 33E to reduce his conviction to murder in the second degree or involuntary manslaughter, arguing that the conviction of murder in the first degree is disproportionate to his culpability.  We address each argument in turn.

a.  <u>Involuntary manslaughter instruction</u>.  The defendant first argues that he is entitled to a new trial because the judge erroneously denied his request to instruct the jury on involuntary manslaughter.

"An involuntary manslaughter instruction is required where 'any view of the evidence will permit a finding of manslaughter and not murder.'"  <u>Commonwealth</u> v. <u>Tyler</u>, 493 Mass. 752, 760

(2024), quoting Commonwealth v. Jessup, 471 Mass. 121, 135 (2015). In determining whether an involuntary manslaughter instruction is warranted, "we consider the evidence in a light most favorable to the defendant" (citation omitted). Commonwealth v. Moseley, 483 Mass. 295, 303 (2019).

"Involuntary manslaughter arises 'where wanton [or] reckless conduct causes death.'" Commonwealth v. O'Brien, 494 Mass. 288, 297 (2024), quoting Commonwealth v. Simpson, 434 Mass. 570, 590 (2001). "Such wanton or reckless conduct is 'intentional conduct that create[s] a high degree of likelihood that substantial harm will result to another person.'" O'Brien, supra, quoting Commonwealth v. Pagan, 471 Mass. 537, 547, cert. denied, 577 U.S. 1013 (2015). See, e.g., Commonwealth v. Welansky, 316 Mass. 383, 387, 391-396, 401 (1944) (owner of night club found guilty of manslaughter, despite his absence at time of deadly fire, where fire resulted from his wanton or reckless disregard of patrons' safety). "[I]n all cases . . . , [the court] must look at the conduct that caused the result to determine whether it was wanton or reckless, not the resultant harm." Commonwealth v. Hardy, 482 Mass. 416, 424 (2019).

In contrast to manslaughter, murder "requires a showing of malice." O'Brien, 494 Mass. at 298. To prove malice for felony-murder, the Commonwealth must establish an intent to cause death, or to cause grievous bodily harm, or to do an act

that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow.  Commonwealth v. Santana-Rodriguez, 496 Mass. 693, 697 n.3 (2025).  "The difference between the elements of the third prong of malice and . . . involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew" (citation omitted).  O'Brien, supra.  See, e.g., Commonwealth v. Childs, 445 Mass. 529, 533-534 (2005) (pointing loaded, cocked gun into occupied motor vehicle created plain and strong likelihood of death due to gun's close proximity to vehicle's occupants and potential for gun to fire).

"Where, as here, the severity of a beating is such that 'it is obvious that the risk of physical harm to the victim creates a plain and strong likelihood that death would follow . . . an instruction on involuntary manslaughter [is] not warranted.'" O'Brien, 494 Mass. at 298, quoting Commonwealth v. Burnham, 451 Mass. 517, 527 (2008).  See, e.g., Moseley, 483 Mass. at 303-304 (defendant was not entitled to involuntary manslaughter instruction where "obvious risk" of physical harm from strangling victim created plain and strong likelihood that death would follow).  "In other words, the 'circumstances of the killing and injuries sustained by the victim' may be '[in]consistent with anything other than [a finding of]

malice.'" O'Brien, supra at 298-299, quoting Commonwealth v. Silva, 471 Mass. 610, 621-622 (2015) (involuntary manslaughter instruction not warranted where defendant and coventurer severely beat victim, knocking him down, kicking him, and stomping on his chest causing victim's eyes to "bug out"). See Commonwealth v. Felix, 476 Mass. 750, 760 (2017) (no error in declining to give involuntary manslaughter instruction where defendant strangled victim for three to five minutes, fracturing her neck cartilage).

In the case of one of the defendant's coventurers, we summarized the evidence as follows:

> "[T]he victim suffered multiple blows to the front of his head, his torso, and his extremities. The beating also included repeated strikes to the back of his head with a frying pan with such ferocity that the pan deformed, and the chaotic carnage of the blood-drenched crime scene indicated a prolonged and violent struggle. These circumstances of the victim's death, and the injuries he sustained, are inconsistent with a finding of . . . mere wanton or reckless conduct likely to cause substantial harm short of death."

O'Brien, 494 Mass. at 299.

Nevertheless, the defendant argues that there were multiple views of the evidence at his own trial that supported an involuntary manslaughter jury instruction. First, the defendant contends that the jury could have concluded that Moscaritolo, as "mastermind," formed a plan to conduct an unarmed burglary where nobody would get hurt. According to the defendant, the jury

could have found that the victim sustained fatal injuries when the plan went awry, that the defendant was not present when the victim sustained these fatal injuries, and that the defendant had no knowledge of any beatings. The defendant points to the lack of evidence suggesting that he had planned to arm himself and the lack of evidence suggesting he personally engaged in any conduct that created a plain and strong likelihood of death.

However, even viewing Moscaritolo as the mastermind who conceived of the plan, as we explained in O'Brien's case, "an involuntary manslaughter instruction is unsupported in view of the evidence showing [the defendant's] participation in the murder as a joint venturer." O'Brien, 494 Mass. at 299. More specifically,

> "[t]he evidence, which included three sets of coventurers' shoe prints alongside the impressions of the victim's bare feet throughout the victim's home, fails to support a theory that . . . [the defendant] merely was present inside the victim's home but was unaware of, and not complicit with, the repeated and brutal assaults on the victim as he moved from room to room around the house, spurting blood from his extensive wounds."

Id. at 299-300. See, e.g., Commonwealth v. Semedo, 422 Mass. 716, 718-719 (1996) (defendant guilty of murder in first degree where he participated in fatal group attack on victim in which

defendant held, kicked, and punched victim while another stabbed him).[3]

Moreover, although there was "no DNA, forensic, or other physical evidence" presented at O'Brien's trial that "directly linked [O'Brien] to the scene," O'Brien, 494 Mass. at 300, the physical evidence presented at the defendant's trial directly linked the defendant to the killing. In particular, a DNA profile linked the defendant to the blue long-sleeved T-shirt, which was saturated with the victim's blood and found on the side of Route 3A. The expected frequency of occurrence of this DNA profile is approximately one in 3.717 sextillion. Another DNA profile linked the defendant to the work glove found on the victim's street, which was likewise stained with the victim's blood.

The defendant also argues that the jury could have inferred that the victim died from crashing into the window without any contact from the coventurers, perhaps as he was attempting to

---

[3] The defendant emphasizes that the shoes seized from his apartment were excluded as being the source of any of the shoe prints that were found in the victim's house and that none of the shoe prints found in the house was ever connected to the defendant. Yet this was true for O'Brien as well. Of the three sets of shoe prints, only one set could be identified as belonging to one of the perpetrators -- Moscaritolo. Just as the lack of a more direct link between a particular set of shoe prints and O'Brien was insufficient, at O'Brien's trial, to raise a view of the evidence that would support a finding of involuntary manslaughter, see O'Brien, 494 Mass. at 299-300, so too is this the case for the defendant.

escape, rather than from any beating by the coventurers. Under this theory, the defendant contends that the act of breaking into the victim's house in the middle of the night amounted to wanton or reckless conduct that resulted in the victim's death by causing him to fear for his life and attempt to escape through the window. In other words, the defendant argues that the Commonwealth would not have satisfied the malice requirement for murder had the jury believed that the victim died solely as a result of crashing into the window.

No view of the evidence supports the defendant's theory. See Commonwealth v. Miranda, 458 Mass. 100, 118 (2010), cert. denied, 565 U.S. 1013 (2011) ("Before a judge is required to give a requested instruction, there must be some basis in the evidence, viewed in the light most favorable to the proponent, supporting the requested instruction" [citation omitted]). Even to the extent that the jury could have found that the underarm incision was caused by the victim crashing through the window, the blood loss from that wound was not the only contributor to the victim's death. The medical examiner testified that the victim's cause of death was exsanguination due to incisions of the right upper extremity and lacerations to the scalp.[4] As the medical examiner testified at trial, the lacerations to the

---

[4] The medical examiner opined that "[s]calp injuries tend to bleed profusely."

scalp classified as blunt force trauma, which would have been caused by a blunt force object. The evidence pointed toward the bloodstained, dented frying pan as the object that caused this injury.

In arguing that the jury could have found that the victim died without contact from either the defendant or one of his coventurers, the defendant fails to account for this evidence -- along with the litany of other injuries that were inflicted across the victim's body prior to his death. But even if the defendant had accounted for the frying pan as a contributor to the victim's death, along with other evidence of the severe beating the victim suffered, and further assuming that the jury could have found that the victim crashed through the window as he tried to escape, an involuntary manslaughter instruction would have still been unwarranted. See O'Brien, 494 Mass. at 300 n.14 ("The defendant speculates that, after the severe beating inflicted on the victim, the victim fell through the window. This scenario . . . does not warrant an involuntary manslaughter instruction"). Cf. Commonwealth v. Garcia, 470 Mass. 24, 32-33 (2014) (defendants acted with malice by locking victim in room to bleed out after beating and shooting him).

As such, even considering the evidence in the light most favorable to the defendant, no reasonable jury could conclude that the defendant and his coventurers' actions did not create a

plain and strong likelihood of death.  Therefore, the judge did not err in declining to instruct the jury on involuntary manslaughter.

b.  Closing argument.  The defendant also contends that the judge erred in declining to grant a mistrial after the prosecutor made several allegedly improper statements during closing argument, including shifting the burden of proof to the defendant, misstating the evidence, and urging the jury to convict on emotion as opposed to the evidence.  Given that defense counsel timely objected to the prosecutor's statements during closing argument, we review for prejudicial error.  See Commonwealth v. Chism, 495 Mass. 358, 401 (2025).  The defendant argues that the cumulative impact of these statements was prejudicial, thereby entitling him to a new trial.

This court reviews the denial of a motion for a mistrial for abuse of discretion.  See Commonwealth v. Martinez, 476 Mass. 186, 197 (2017).  "The trial judge is in the best position to assess any potential prejudice and, where possible, to tailor an appropriate remedy short of declaring a mistrial."  Id. "[T]he burden of demonstrating an abuse of discretion is a heavy one."  Id., quoting Commonwealth v. Medeiros, 395 Mass. 336, 351 (1985).

We examine each of the challenged statements made during closing argument in turn, considering them "in the context of

the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 231 (1992).

i. Burden shifting. The defendant argues that the prosecutor improperly shifted the burden of proof to the defense when she said, "The defense wants you to find that Michael Moscaritolo committed this crime. That somehow his guilt, Michael Moscaritolo, exonerates this defendant. That simply isn't the case." According to the defendant, this comment implied that the defendant had an affirmative duty to bring forth evidence of his innocence and exonerate himself. He also argues that the comment improperly suggested to the jury that if they found that Moscaritolo was guilty, then they would also have to convict the defendant.

A prosecutor "cannot make statements that shift the burden of proof from the Commonwealth to the defendant" (citation omitted). Commonwealth v. Johnson, 463 Mass. 95, 112 (2012). Burden shifting arises when a prosecutor comments on the defendant's decision not to testify, see id.; calls the jury's attention to the defendant's failure to call a particular witness, see id.; or otherwise signals "to the jury that the defendant has an affirmative duty to bring forth evidence of his innocence, thereby lessening the Commonwealth's burden to prove every element of a crime," Commonwealth v. Tu Trinh, 458 Mass.

776, 787 (2011). Within this limit, however, a "prosecutor is entitled to make a fair reply to the defendant's closing argument and may properly comment on the trial tactics of the defen[s]e and on evidence developed or promised by the defen[s]e" (quotations and citations omitted). Commonwealth v. Da Lin Huang, 489 Mass. 162, 180 (2022).

In assessing the propriety of the prosecutor's statement here, we consider two key points. First, the prosecutor's statement was made in response to arguments of defense counsel. While the right to "fight fire with fire" is limited, Commonwealth v. Burke, 373 Mass. 569, 576 (1977), the prosecutor here was specifically responding to defense counsel's argument that Moscaritolo -- and not the defendant -- was guilty of the murder, see Commonwealth v. Cheng Sun, 490 Mass. 196, 218 (2022) (concluding that prosecutor was entitled to respond to argument that other coventurers were "the only ones to carry out the murder" by asserting that, although other coventurers may have been more vicious, this "should not distract [the jury] from judging the evidence about [the defendant]," as "he's the one here that is on trial").

Second, rather than bootstrapping the defendant's guilt using Moscaritolo's guilt, the prosecutor emphasized the evidence that independently tied the defendant to the crimes as a joint venturer. Specifically, following the challenged

statement, the prosecutor highlighted the discarded shirt and work glove, both of which were linked to the defendant through DNA evidence and were stained with the victim's blood.

When viewed in context, the prosecutor's statement did not shift the burden of proof but rather shifted the jury's focus from Moscaritolo's guilt (as defense counsel emphasized) to the evidence of the defendant's guilt. See Commonwealth v. Phillips, 495 Mass. 491, 502-503 (2025) (concluding that prosecutor's closing statement that defense counsel threw "all of this speculation like spaghetti against a wall because they don't want you to focus on th[e] evidence" was not impermissible burden shifting because it was responsive to defense counsels' closings, which asked jury to consider alternate suspects and theories). At no time did the prosecutor express or imply that the defendant was required to exonerate himself. Therefore, this statement was not improper.

ii. Coventurers acting in concert. Next, defense counsel argued at trial that the prosecutor improperly suggested that "all three [coventurers] participated in the beating" of the victim and "left [the scene] at the exact same time" despite no evidentiary support for these claims.

The defendant did not identify a specific statement from the Commonwealth's closing where the prosecutor argued that all three coventurers participated in beating the victim, although

we note there are various statements to that effect.  For example,

> "[T]hese three men robbed and beat [the victim] and left him to die in a pool of blood on the kitchen floor of his own home."

> "It was a beating.  It was three men on one man, a[n] unsuspecting and defenseless man in his own home."

> "I suggest they're beating him.  They're striking him. They're struggling with him."

The defendant argues that the prosecutor's claims are improper because there was no evidence of who participated in the beating, let alone that all three had done so.

As to the claim that the three coventurers left together, the defendant points to the following statement:  "They left together.  I'd suggest they started this plan together, and they left him there together."

It is well established that a prosecutor may not misstate evidence or refer to facts not in evidence in a closing argument.  See Commonwealth v. Walters, 472 Mass. 680, 703 (2015), S.C., 479 Mass. 277 (2018).  "A prosecutor may, however, argue forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence" (quotation and citation omitted).  Commonwealth v. Wilkerson, 486 Mass. 159, 179 (2020).  See Commonwealth v. Blaikie, 375 Mass. 601, 612 (1978) ("In their summations to the jury, counsel may argue inferences from the evidence which are most favorable

to his or her theory of the case, as long as the inferences drawn are reasonable").  Here, given the evidence produced at trial, the inferences that the prosecutor drew in these statements -- that the three men started, participated, and left together -- were reasonable.

For example, there was evidence that after Moscaritolo planned with the defendant for "three guys" to go to the victim's Marshfield house to rob the victim, O'Brien picked up the defendant on the evening that the plan was executed.  Based on cell phone records, it can be reasonably inferred that the defendant then traveled with O'Brien to the Marshfield area, where they met Moscaritolo.  Then, the cell phones of all three coventurers (acting in what the jury could infer was a coordinated fashion) were disconnected from the cellular network for several hours that night into the early morning hours of the following day.  There was further evidence suggesting that, during that time, all three men were present for and participated in the victim's violent beating.  Among this evidence, three distinct shoe prints were found in the victim's bloodstains throughout the house, and several items stained with the victim's blood were linked to at least one of the men through DNA evidence; for example, it can be reasonably inferred that the defendant wore a shirt saturated with the victim's blood.  Further, a neighbor heard the voices of three or four

men arguing at 3 A.M. before seeing a car leaving the victim's driveway.

All of this, among other evidence, permits the reasonable inferences that the prosecutor made. Therefore, the prosecutor's statements were not improper.

iii. Cell phone records. The defendant also argues that the prosecutor misstated the evidence when she suggested to the jury that O'Brien's cell phone records placed him at Kalil's house on the afternoon of September 16, 2015. Specifically, the prosecutor stated:

> "These phone records are Mr. O'Brien's. These phone records don't just give you longitude and latitude like the other ones; they actually tell you where the person is at a time. I suggest [you] look at these phone records, and you're going to see what corroborates Lauren Kalil is that on September 16th, that's where they are. That's where he is, I suggest, Mr. O'Brien is in Quincy right at the time Kalil says so."

The defendant contends that the prosecutor misstated the evidence because the cell phone records only show the location of the cell tower to which O'Brien's cell phone connected rather than his precise location. And, as the records show, O'Brien's cell phone connected to the location of a cell tower on a different street in Quincy rather than to Kalil's exact address. The Commonwealth's expert testified that one cannot ascertain the location of a cell phone with precision based on the tower to which it connected and that, theoretically, a cell phone

could be located twenty to twenty-five miles away from the tower.  As such, the defendant argues that O'Brien may not have even been within Quincy at that time, yet the Commonwealth posited it as fact that he had been at Kalil's house just as Kalil claimed.  According to the defendant, this misstatement had the effect of significantly bolstering Kalil's credibility.

Here, the prosecutor was contrasting two pieces of evidence.  First, the prosecutor referenced O'Brien's cell phone records, which show the location of the cell tower to which his cell phone connected but do not, as the prosecutor stated, provide "longitude and latitude."  Second, the prosecutor referenced "other" evidence -- specifically, data admitted at trial that, unlike O'Brien's cell phone records, offered estimates of where a cell tower was located based on longitude and latitude within a certain degree of accuracy, for example, between a range of 400 to 5,000 meters.

Rather than suggesting that O'Brien must have been at Kalil's exact address at the time she said he was, as the defendant suggests, the prosecutor was suggesting that O'Brien was in Quincy at the time Kalil said he was.  This is a permissible inference drawn from the cell phone records that show that O'Brien's cell phone connected to a cell tower located in Quincy.  See Commonwealth v. Hobbs, 482 Mass. 538, 547 (2019) ("the location of a suspect's cell phone at the time of the

criminal activity provides evidence directly related to his or her participation, or lack thereof, in the criminal activity, and the location of the cell phone at that time can reasonably be expected to be found in the CSLI records requested").  See also Commonwealth v. Parker, 481 Mass. 69, 74 (2018) (inferences that prosecutors suggest juries draw in closing arguments "need only be reasonable and possible based on the evidence before the jury").  As such, this statement was not improper.

iv.  Request for accountability.  Lastly, the defendant argues that it was improper for the prosecutor to ask the jury to hold the defendant accountable.  During closing argument, the prosecutor said, "We ask you to find -- hold the defendant -- excuse me -- accountable for his deliberate, intentional and malicious actions."

While some cases have suggested that it is improper for the Commonwealth to urge the jury to hold the defendant accountable, see Da Lin Huang, 489 Mass. at 181; Commonwealth v. Jenkins, 458 Mass. 791, 797 (2011) ("prior cases have suggested that holding the defendant accountable is improper language"), others have referred to such remarks as "characteristic of enthusiastic rhetoric, strong advocacy, and excusable hyperbole, [that do] not cross the line between fair and improper argument" (quotation and citation omitted), Commonwealth v. Tavares, 471 Mass. 430, 444 (2015).

Regardless of whether there was error here, we discern no prejudice to the defendant when viewing the prosecutor's statement in the context of the evidence before the jury and the judge's instructions.  In determining whether there was prejudice, we consider "whether the error was limited to collateral issues or went to the heart of the case, what specific or general instructions the judge gave the jury which may have mitigated the mistake, and whether the error, in the circumstances, possibly made a difference in the jury's conclusions" (quotations and citation omitted).  Commonwealth v. Colina, 495 Mass. 13, 37 (2024).

The prosecutor's closing argument, as a whole, "properly marshalled the [substantial] evidence" heretofore discussed against the defendant.  Da Lin Huang, 489 Mass. at 181.  See Commonwealth v. Torres, 437 Mass. 460, 464-466 (2002) (prosecutor's request during closing argument to hold defendant accountable did not prejudice defendant where evidence of guilt was overwhelming).  Moreover, given the statement in context, the jury would have understood that the prosecutor was asking them to find the defendant guilty based on the evidence presented.  Immediately following the challenged statement, the prosecutor told the jury "to return a verdict that is fair and just and that is consistent with all of the evidence that [they] heard."  The judge also properly instructed the jury that

closing arguments are not evidence and that they should not be swayed by sympathy for the victim.  See Chism, 495 Mass. at 403 ("the judge mitigated potential prejudice by repeatedly instructing the jury that verdicts must be based on the evidence, not feelings of sympathy, and that closing arguments were not evidence").  Because we are sure that any potential error here did not influence the jury or had but very slight effect, there was no prejudice to the defendant.  See Commonwealth v. Alvarez, 480 Mass. 299, 305 (2018).

Where, as here, the defendant was not prejudiced by any statements made by the prosecutor during closing argument, the judge did not abuse his discretion in denying the defendant's motion for a mistrial.  See Commonwealth v. Gomes, 443 Mass. 502, 509 (2005).

c.  Firearm possession charges.  The defendant additionally requests that we vacate his five convictions of unlawful possession of a firearm because the Commonwealth did not prove that he lacked a license to carry a firearm.  "When the defendant was convicted, licensure was an affirmative defense to a charge of unlawful possession of a firearm."  O'Brien, 494 Mass. at 303.  See Guardado I, 491 Mass. at 687.  "However, after the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022) (Bruen), we concluded that the Commonwealth must prove absence of

licensure." O'Brien, supra, citing Guardado I, supra at 690.
"Because Bruen was decided after the defendant's trial but while
the case was pending on appeal, he is entitled to the benefit of
the new rule; that is, the right to have the Commonwealth prove
that he lacked a license." O'Brien, supra, quoting Guardado II,
493 Mass. at 12. "The proper remedy is remand for a new trial
on the firearm possession charges." O'Brien, supra. See
Commonwealth v. Robinson, 493 Mass. 775, 796 (2024) (vacating
unlawful possession charge for new trial).

d. Double jeopardy. Next, the defendant argues that we
must vacate either his unarmed robbery or aggravated burglary
conviction as duplicative of the felony-murder conviction.

"When a murder conviction is [solely] based on a felony-
murder theory, the underlying felony, whatever it may be, is
always a lesser included offense and the conviction for that
felony, in addition to the conviction of murder, is duplicative"
(citation omitted). Commonwealth v. Simon, 481 Mass. 861, 871
(2019).[5] Where there is only one underlying felony, the proper

---

[5] Conversely, where "a defendant is convicted of murder in
the first degree on a theory of felony-murder, and [also] is
convicted of murder in the first degree on [at least one other]
theory, and we affirm the convictions on both [or all] theories,
the conviction of the predicate felony is not duplicative."
Commonwealth v. Foster, 471 Mass. 236, 244 (2015). See
Commonwealth v. Leiva, 484 Mass. 766, 795 (2020). Here, the
jury found the defendant guilty of murder in the first degree
based solely upon a theory of felony-murder.

remedy "is to vacate both the conviction and the sentence on that [predicate] felony" (citation omitted). Id. at 872. Here, however, there are two underlying felonies -- unarmed robbery and aggravated burglary. The remedy in this situation is to vacate the conviction of whichever felony the court determines to be "better suited to serve as the predicate felony" -- that is, the felony that is "more closely connected . . . to the victim's murder" (citation omitted). Id. Our prior cases help elucidate this standard.

First, in Commonwealth v. Rasmusen, 444 Mass. 657, 666 (2005), the defendant was convicted of felony-murder on two underlying felonies -- armed burglary and home invasion. This court noted that the defendant's home invasion conviction depended on the Commonwealth's proof of the defendant's knowledge that a different individual -- one who was not killed -- was present in the apartment at the time the defendant and his friends forced their way inside. Id. at 666-667. Comparatively, the armed burglary conviction, lacking such a link to the individual who was not killed, had "broader application" to the defendant's murder of the victim. Id. at 667. Accordingly, we vacated the defendant's conviction and sentence for armed burglary as duplicative of his felony-murder conviction. Id.

Similarly, in Simon, 481 Mass. at 872, the defendant was convicted of felony-murder with the predicate offenses of both armed robbery and armed home invasion. The defendant broke into the victim's apartment, took money and rare coins from the victim's safe, and shot the victim in the head before being confronted by the victim's brother. Id. at 872 n.13. Based on these facts, we determined that "[t]he armed robbery conviction, arising from the taking of cash and coins from [the victim's] apartment, [was] more directly related to his murder than the armed home invasion, which also relate[d] to the defendant's confrontation with [the victim's brother]." Id. As such, where the armed robbery conviction was "more closely related" to the murder, we vacated that conviction as the underlying felony. Id. at 872.

Here, the unarmed robbery conviction depended on the Commonwealth's proof that, inter alia, the defendant or one of his coventurers either applied force and violence to the body of the victim or put the victim in fear by threatening words or gestures. See Commonwealth v. Mora, 477 Mass. 399, 407 (2017). The aggravated burglary (assault on occupant) conviction, on the other hand, required, inter alia, that the Commonwealth prove that the defendant or one of his coventurers committed an actual assault on the victim. See Commonwealth v. Bolden, 470 Mass. 274, 278 (2014). Assault is "an attempted application of

physical force or a threat of the use of physical force, either by an attempt to do bodily harm, or by placing the victim in fear of imminent bodily harm."  Commonwealth v. Gorassi, 432 Mass. 244, 248 (2000).  Given the emphasis on bodily harm, the aggravated burglary conviction is more closely connected to the murder than the unarmed robbery, where the victim suffered significant bodily harm, so it is better suited to serve as the predicate felony.  The defendant's aggravated burglary conviction should thus be vacated as duplicative.

e.  General Laws c. 278, § 33E.  Having reviewed the entire record, we discern no basis to grant relief under § 33E.

3.  Conclusion.  For the reasons discussed, the judgments as to the defendant's five convictions of unlawful possession of a firearm are vacated and those verdicts are set aside.  The judgment as to his conviction of aggravated burglary is also vacated, and that verdict is set aside.  The judgments as to the defendant's remaining convictions are affirmed.  We remand this matter to the Superior Court to allow for a new trial on the charges of unlawful possession of a firearm.

So ordered.